**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

SHELL VACATIONS LLC, on behalf of
itself and all others similarly situated,

     Plaintiff,

     vs.

MARSH & MCLENNAN COMPANIES,
INC.; MARSH INC.; AON
CORPORATION; AON BROKERS
SERVICES, INC.; AON RISK SERVICES
COMPANIES, INC.; AON RISK
SERVICES INC. U.S.; AON GROUP, INC.;
AON SERVICES GROUP, INC.; WILLIS
GROUP HOLDINGS LTD.; WILLIS
GROUP LTD.; WILLIS NORTH
AMERICA, INC.; UNIVERSAL LIFE
RESOURCES, d/b/a ULR; UNIVERSAL
LIFE RESOURCES, INC., d/b/a ULR
INSURANCE SERVICES, INC.;
BENEFITS COMMERCE; DOUGLAS P.
COX; ACE LIMITED; ACE INA
HOLDINGS, INC.; ACE INA; ACE USA;
AMERICAN INTERNATIONAL GROUP,
INC.; HARTFORD FINANCIAL
SERVICES GROUP, INC.; MUNICH
AMERICAN RISK PARTNERS, INC.;
AMERICA RE-INSURANCE CO.;
MUNICH REINSURANCE CO.; METLIFE,
INC.; UNUMPROVIDENT
CORPORATION; ST. PAUL TRAVELERS
COS., INC.; ZURICH AMERICAN
INSURANCE CO., d/b/a ZURICH NORTH
AMERICA; and NATIONAL FINANCIAL
PARTNERS CORPORATION,

     Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**05C 0270**

Civil Action No.

**JUDGE MAROVICH**

**CLASS ACTION COMPLAINT**

**MAGISTRATE JUDGE
GERALDINE SOAT BROWN**

**JURY TRIAL DEMANDED**

I.   **PRELIMINARY STATEMENT**

    1.    This is an action for treble damages and injunctive relief brought under Section 1

of the Sherman Act (15 U.S.C. §1), the Racketeer Influenced and Corrupt Organizations Act

("RICO") (18 U.S.C. §1961 *et seq.*), federal and state common law, and the laws of the various

states that prohibit antitrust violations and unfair and/or deceptive trade practices. Plaintiff Shell Vacations LLC ("Shell Vacations" or "Plaintiff") alleges that the Insurance Broker Defendants (as that term is defined below) conspired with each other and with the Insurer Defendants (as that term is defined below), in violation of federal and state antitrust laws, to allocate brokerage customers and rig bids for Insurance Products (as that term is defined below) offered to those customers. Because brokerage clients were misled and deceived about these practices, and because kickback schemes were effectuated between the Insurance Broker Defendants and the Insurer Defendants, both sets of defendants were unjustly enriched and violated various state laws prohibiting unfair and/or deceptive trade practices. In addition, under state and/or federal common law, the Insurance Broker Defendants breached fiduciary duties to their clients by entering into agreements with the Insurer Defendants that created obvious conflicts of interest. Plaintiff brings this lawsuit as a class action on behalf of all clients of the Insurance Broker Defendants who bought Insurance Products from the Insurer Defendants and/or their co-conspirators from at least January 1, 1994 to the present. Plaintiff respectfully demands a trial by jury and complains and alleges on information and belief as follows.

## II.    JURISDICTION AND VENUE

2.      The claims in this complaint are brought under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§15 and 26), and 18 U.S.C. §§1961, 1962 and 1964, to recover treble damages and costs of suit, including reasonable attorneys' fees, against defendants for the injuries sustained by Plaintiff and the members of the proposed class by reason of the violations of Section 1 of the Sherman Act (15 U.S.C. §1) and violations of 18 U.S.C. §§1962(c) and (d) as alleged herein.

3.      The claims in this complaint are also brought under common law breach of fiduciary duty, common law unjust enrichment, and state laws prohibiting antitrust violations and unfair and/or deceptive business practices. Restitution, including disgorgement of profits, is sought for such violations. Where applicable, damage remedies (including treble damage remedies) are also sought.

4.    In addition, this action is instituted to secure injunctive relief against defendants to prevent them from further violating Section 1 of the Sherman Act and state laws as alleged in this complaint.

5.    Jurisdiction is conferred upon this Court by 28 U.S.C. §1331, §1337, by Sections 4 and 16 of the Clayton Act (15 U.S.C. §§15 and 26), by 18 U.S.C. §§1964(a) and (c) and 1965, and by 28 U.S.C. §1367.

6.    Venue is proper in this judicial district pursuant to Sections 4, 12, and 16 of the Clayton Act (15 U.S.C. §§15, 22 and 26), and 28 U.S.C. §1391(b), (c), and (d).

7.    Defendants maintain offices, have agents, transact business, or are found within this judicial district. Plaintiff's claims alleged in this complaint arise in part within this district. The interstate trade and commerce described herein is and has been carried out in part within this district. Defendants have provided services and products in the stream of commerce that have reached this district.

III.   **PARTIES**

8.    Plaintiff Shell Vacations LLC, d/b/a Shell Vacations Club, has its principal place of business at 40 Skokie Boulevard, Suite 350, Northbrook, Illinois 60062. Shell Vacations is a leader in the vacation ownership industry, with over 2,500 employees operating 17 vacation resorts in the United States, Canada and Mexico. Shell Vacations purchased Insurance Products (as defined herein) via one or more of the Insurance Broker Defendants (as defined herein) during the Class Period (as defined herein).

9.    Defendant Marsh & McLennan, Inc. ("MMC") is a Delaware corporation having its principal place of business at 1166 Avenue of the Americas, New York, New York 10036-2774. MMC provides risk and insurance services to its customers through its subsidiaries as broker, agent or consultant for insureds, insurance underwriters or other brokers. MMC is the largest provider of insurance brokering and consulting services in the world.

10.   Defendant Marsh, Inc. ("Marsh") is a wholly-owned subsidiary of MMC with its principal place of business at 1166 Avenue of the Americas, New York, New York 10036-2774.

Marsh claims at its website that it is "the world's leading risk and insurance services firm," employing 42,000 people in 410 owned and operated offices worldwide, including a location at 500 West Monroe Street in Chicago, Illinois. Marsh provides, *inter alia*, insurance brokering services and its annual revenues in 2003 were $6.9 billion. Any action alleged herein that was undertaken by Marsh was undertaken with the knowledge and approval of its parent, MMC.

11. Defendant Aon Corporation ("Aon") is a Delaware company that has its principal place of business at 200 E. Randolph St., Chicago, Illinois 60601. Aon provides risk and insurance brokerage services through its subsidiaries to its clients and is the second largest insurance broker behind MMC; together Marsh and Aon control about 70 percent of the domestic corporate insurance market. Aon has 37,000 employees worldwide and reported earning $1.5 billion on its risk and insurance brokerage services in 2003. Among the subsidiaries through which Aon Corporation operates are: defendants Aon Brokers Services Inc.; Aon Risk Services Companies, Inc.; Aon Risk Services Inc. U.S.; Aon Group, Inc.; and Aon Services Group, Inc. Any action undertaken by any of Aon Corporation's subsidiaries related to the matters described herein were undertaken with the knowledge and approval of Aon Corporation. For the purposes of this complaint, the term "Aon" refers collectively to Aon Corporation and its subsidiaries.

12. Defendant Willis Group Holdings, Ltd. ("WGHL") is a Bermudan corporation the shares of which are listed and traded on the New York Stock Exchange with its principal place of business at Ten Trinity Square, London EC3P 3AX, England. It provides insurance brokerage and related services in the United States through various subsidiaries that have more than 80 offices located in 35 states. Among those subsidiaries are defendants Willis Group Ltd. (a private limited company registered in both England and Wales with its corporate headquarters at the address listed above) and Willis North America, Inc. (a Delaware company with its corporate headquarters in New York, New York). Any action undertaken by any of WGHL's subsidiaries related to the matters described herein was undertaken with the knowledge and approval of

WGHL. For the purposes of this complaint, the term "Willis" refers collectively to WGHL and its subsidiaries.

13.     Defendant Universal Life Resources, d/b/a ULR, is a California limited partnership having its principal place of business at 12264 El Camino Real, Suite 303, San Diego, California. ULR is a national group life, accident and disability consulting company that works with insurers to design and broker life, accident and disability programs. ULR has regional offices in five states and its general partner is defendant Universal Life Resources, Inc., d/b/a ULR Insurance Services, Inc.. For the purposes of this complaint, the term "ULR" refers to both of these entities.

14.     Defendant Douglas P. Cox ("Cox") is President and CEO of ULR and sole shareholder of defendant Benefits Commerce, an entity that has been used in ULR's unlawful conduct, as described below. Cox controls ULR and treats the ULR entities as his personal instrumentalities.

15.     Defendant ACE Limited ("ACE Ltd.") is a Cayman Islands corporation with global headquarters at 17 Woodbourne Avenue, Hamilton HM08, Bermuda. Defendant Marsh played a leading role in creating ACE Ltd. in 1985. ACE Ltd. is the holding company for the ACE Group of Companies, also incorporated in the Cayman Islands. Through its subsidiaries, ACE Ltd. provides property, casualty, accident and health insurance. ACE Ltd. is the owner of defendant ACE INA Holdings, Inc.

16.     Defendant ACE USA is one of the companies held by ACE Ltd. and comprises the U.S. and Canadian operations of defendant ACE INA and ACE Westchester. Its principal place of business is at Two Liberty Place, 1101 Chestnut Street, Philadelphia, Pennsylvania 19103. Any action alleged herein that was undertaken by ACE USA or any of its subsidiaries was undertaken with the knowledge and approval of ACE Ltd.

17.     Defendant American International Group, Inc. ("AIG") is a Delaware company with its principal place of business at 70 Pine Street, New York, New York 10270. Through its subsidiaries, AIG provides, *inter alia,* general, property casualty, and life insurance products.

18.     Defendant The Hartford Financial Services Group Inc. ("Hartford") is a Delaware company having its principal place of business at Hartford Plaza, Hartford, Connecticut 06115-1900. Hartford is among the largest providers of individual life, group life and disability, and property casualty insurance products in the United States.

19.     Defendant Munich-America Risk Partners, Inc. ("MARP") is a division of defendant American Reinsurance Co. ("Amre"), which is, in turn, a wholly-owned subsidiary of defendant Munich Reinsurance Co. ("Munich Re"). MARP provides risk transfer and sharing and risk management solutions to what it calls on its website non-traditional reinsurance clients. MARP's risks are underwritten by Amre and other members of the Munich Re Group. Amre has its principal place of business at 555 College Road East, Princeton, New Jersey 08543. Munich Re's headquarters is located at Konigstrasse 107, 80802 München, Germany. Any actions alleged herein to have been undertaken by MARP were done with the knowledge and approval of its parents, Amre and Munich Re.

20.     Defendant National Financial Partners Corp. ("NFP"), with national headquarters located at 787 Seventh Avenue, 49th Floor, New York, New York 10019, is a leading distributor of financial service products and operates a national distribution network of over 1,500 producers in 40 states and Puerto Rico.

21.     Defendant MetLife, Inc. ("MetLife") is a Delaware corporation having its principal place of business at One Madison Avenue, New York, New York 10010-3690. MetLife is one of the leading providers of insurance and other financial services in the United States. In 2003, MetLife earned $9 billion in revenues and fees.

22.     Defendant UnumProvident Corporation ("UnumProvident") is a Delaware company having its principal place of business at 1 Fountain Square, Chattanooga, Tennessee 37402. Unum Provident is the parent entity for, *inter alia*, a group of insurance companies, including Unum Life Insurance Co. of America, Provident Life and Accident Insurance Co., The Paul Revere Life Insurance Co. and Colonial Life & Accident Insurance Co.

23.     Defendant St. Paul Travelers Cos., Inc. ("St. Paul") is a Minnesota corporation having its principal place of business at 385 Washington St., St. Paul, MN 55102. Through various subsidiaries, St. Paul provides numerous lines of property and liability insurance.

24.     Defendant Zurich American Insurance Co., d/b/a Zurich North America ("ZNA"), is an insurer that has its principal place of business at 100 American Lane, Schaumburg, IL 60196. It provides personal, life and automobile insurance to businesses and its business units include Centre Insurance, Empire Insurance, Universal Underwriters Group, Zurich Corporate Solutions, ZNA's Specialty Excess Casualty Unit and Zurich Global Energy. Any action alleged herein that was undertaken by any of those subsidiaries was undertaken with the knowledge and approval of ZNA.

## IV.   DEFINITIONS

25.     For the purposes of this complaint, MMC, Marsh, ULR, Benefits Commerce, Cox, Aon (including its subsidiaries) and Willis (including its subsidiaries) are referred to collectively as the "Insurance Broker Defendants." ACE Ltd. and its subsidiaries sued herein, ZNA, MetLife, NFP, AIG, Hartford, UnumProvident, MARP, Amre, Munich Re, and St. Paul are referred to collectively as the "Insurer Defendants."

26.     For the purposes of this complaint, the Insurer Defendants and the Insurance Broker Defendants will be referred to collectively as "Defendants."

27.     For the purposes of this complaint, the term "Insurance Products" consists of commercial general liability insurance, property and casualty insurance, excess property or casualty or liability insurance, health insurance, surplus lines insurance, personal life and accident insurance, and reinsurance.

28.     For the purposes of this complaint, the term "contingent commission agreement" refers to an agreement whereby insurers pay sums to insurance brokerage companies to obtain business from the latter. The precise terms of these agreements vary, but they commonly require the insurance company to pay the broker based on one or more of the following: (a) how much business the broker's clients place with the insurance company; (b) how many of the broker's

clients renew policies with the insurance company; and (c) the profitability of the business placed by the broker.

29.     The Insurance Broker Defendants have various names for the contingent commission arrangements into which they enter with insurers. Marsh calls them "Market Services Agreements" ("MSAs") and asserts that they are based primarily, but not exclusively, on premium volume or growth. Previously, Marsh used to refer to these agreements as "Placement Service Agreements" ("PSAs"). Willis has indicated that contingent commission arrangements encompass compensation based on premium volume transacted with an insurer and compensation based on the profit performance of business transacted with an insurer. Aon refers to contingent commission arrangements as "Compensation for Services to Underwriters" agreements, or "CSUs".

## V.     CLASS ACTION ALLEGATIONS

30.     Plaintiff brings this action on behalf of itself and as a class action under the provisions of Rule 23(a) and (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all members of the following class (hereinafter "the Class"):

> All persons and entities (excluding Defendants, their subsidiaries and affiliates, and their co-conspirators) who retained the services of any Insurance Broker Defendant for the procurement or renewal of Insurance Products and subsequently purchased any Insurance Products from one or more of the Insurer Defendants and/or their co-conspirators at any time during the period from at least January 1, 1994 to the present (the "Class Period").

31.     Plaintiff does not know the exact size of the Class because such information is in the exclusive control of the Defendants. Nevertheless, there are potentially millions of class members geographically dispersed throughout the United States. Due to the nature of the trade and commerce involved, Plaintiff believes that the Class members are so numerous that joinder of all Class members in this action is impracticable.

32.     Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff and all Class members are all direct purchasers of Insurance Products who paid

artificially inflated prices for those products due to Defendants' contract, conspiracy or combination alleged herein.

33. Plaintiff will fairly and adequately protect the interests of the Class as the interests of Plaintiff are coincident with, and not antagonistic to, those of the Class. In addition, Plaintiff is represented by counsel who are experienced and competent in the prosecution of complex class action and antitrust litigation.

34. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

35. Questions of law and fact common to the members of the Class predominate over questions that may affect only individual members. Defendants have acted on grounds generally applicable to the entire Class. Among the questions of law and fact common to the Class are:

      a.    whether Defendants and their co-conspirators engaged in a contract, conspiracy or combination to fix prices of, rig bids for, or allocate customers of Insurance Products sold in the United States;

      b.    whether the alleged contract, conspiracy or combination violated (i) Section 1 of the Sherman Act, 15 U.S.C. §1, (ii) 18 U.S.C. §§1962(c) and (d), and/or (iii) the state laws identified herein;

      c.    the duration and extent of the contract, conspiracy or combination alleged herein;

      d.    whether the Defendants and their co-conspirators took affirmative steps to conceal the contract, conspiracy or combination;

      e.    whether each of the Defendants was a participant in the contract, conspiracy or combination alleged herein;

      f.    whether the Defendants' conduct caused the prices of Insurance Products to be set at an artificially high and supra-competitive level;

g.    the effect of Defendants' contract, conspiracy or combination upon interstate commerce;

h.    whether the Insurance Broker Defendants agreed to represent the best interests of their clients;

i.    whether Contingent Fees or other payments made by insurance companies or their affiliates to the Insurance Broker Defendants created conflicts of interest for the Insurance Broker Defendants;

j.    whether the Insurance Broker Defendants breached fiduciary duties owed to Plaintiff and Class members;

k.    whether the Insurance Broker Defendants' breach of fiduciary duties requires them to forfeit and disgorge all contingent commissions and related fees received in connection with the insurance brokerage services it rendered to Plaintiff and Class members;

l.    whether Defendants fraudulently concealed or failed to disclose to Plaintiff and Class members the existence and amount of Contingent Fees or other payments made by insurance companies to the Insurance Broker Defendants;

m.    the appropriate measure of damages; and

n.    whether Plaintiff and Class members are entitled to declaratory and/or injunctive relief.

36.    Class action treatment is superior to the alternatives for the fair and efficient adjudication of the controversy alleged herein. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would entail. No difficulties are likely to be encountered in the management of this class action that would preclude its maintenance as a class action, and no superior alternative exists for the

fair and efficient adjudication of this controversy. The Class is readily ascertainable from the Defendants' records.

37.     Defendants have acted on grounds generally applicable to the entire Class, thereby making final injunctive relief or corresponding declaratory relief appropriate with respect to the Class as a whole. Prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for Defendants.

## VI.     TRADE AND COMMERCE AFFECTED

38.     Beginning at least as early as January 1, 1994, and continuing until the present, the exact dates unknown to Plaintiff at this time, Defendants engaged in continuing contract, conspiracy or combination in restraint of trade in violation of the Sherman Act.

39.     During the Class Period herein alleged, the Insurer Defendants sold, and the Insurance Broker Defendants brokered the sales of, substantial quantities of Insurance Products in a continuous and uninterrupted flower in interstate commerce.

40.     The Defendants' business activities that are the subject of this Complaint were within the flow of and substantially affected interstate trade and commerce.

41.     During the Class Period herein alleged, the Defendants' conduct and their co-conspirators' conduct occurred in, affected, and foreseeably restrained the interstate commerce of the United States, as well as commerce in each of the states.

## VII.     ALLEGATIONS OF WRONGDOING

### A.     All Broker And Insurer Defendants Engaged In An Unlawful Use Of Contingent Commissions

42.     The practice of using contingent commission arrangements was widespread throughout the insurance industry and ongoing for years. The practice was the product of an unlawful conspiracy. Any single insurance broker could not continue to utilize these arrangements unless it knew and had the understanding that its competing brokers were likewise using them and that insurers were acquiescing in and cooperating with their use. Individual

insurers likewise agreed to these arrangements with the knowledge and understanding that other competing insurers agreed to them as well.

43. The practice reached its current state beginning in the mid 1990s, due to the efforts of William Gilman ("Gilman"), a Managing Director at Marsh and the Executive Marketing Director of Marsh Global Broking ("MGB"). According to an October 22, 2004 report in the *Wall Street Journal*, "Mr. Gilman helped to orchestrate the system at the heart of the scandal—channeling business to insurance companies that paid the biggest commissions to Marsh, rather than to insurers willing to provide the lowest quotes, according to more than two dozen current and past employees of Marsh and insurance firms." In the early 1990s, in order to satisfy MMC's demand for greater profits, Marsh developed PSAs (later known as MSAs) that required insurers to pay Marsh fees based on volume of business alone. This system gave the incentive to brokers like Marsh to direct clients to insurers that would not necessarily offer the best price, an obvious conflict of interest. AIG was one of the first insurers to accept this type of arrangement, and other insurers promptly followed suit.

44. In order to maximize profits from PSAs, they were imposed on business throughout Marsh, and were centralized under MGB. According to the *Wall Street Journal* article cited above, "[t]his unit directed the PSA fee plan and served as the clearinghouse of dealings between Marsh and its insurance clients in several practice areas, including midsize companies that buy property and casualty insurance." Through MGB, hundreds of contracts were channeled to insurers who provided the most lucrative remuneration to Marsh. According to the same article, "Robert Newhouse, Marsh's former chairman of U.S. operations, said Global Broking's purpose was to maximize revenues and that all Marsh employees and field agents were to abide by the Global Broking system . . ."

45. As this system was implemented, the pressure to produce more profits each year became unrelenting. Again from the October 22, 2004 *Wall Street Journal* report: "'We had to do our very best to hit our numbers,' says Robert Amoroso, former manager of Marsh's Philadelphia branch. 'Each year, our goals were more aggressive.'" Meanwhile, Roger Egen,

President and Chief Operating Officer of the Marsh brokerage unit was quoted in the article as having told his management team that "[e]ach time I see Jeff[ery Greenberg, CEO of MMC] I feel like I have a bull's eye on my forehead."

46.     This internal pressure for higher profits was pursued at the expense of Marsh's clients, who were deprived of fair price competition for insurance products. As part of the effort to steer business to insurers who paid the most in PSA/MSA fees to Marsh, the fictitious "A, B, C" quotation system described below was utilized. In the United States alone, Marsh has identified 61 insurers (including all of the Insurer Defendants herein) with whom it used MSAs. It has conceded that it uses MSAs "with most of its principal insurance markets." It claims that MSAs "are commonplace in the industry and Marsh has them with almost all major insurers."

47.     None of these practices were fully and accurately described to clients; many practices (such as the use of rigged bids) were never disclosed at all, even though Marsh/MMC, like other brokers, had a fiduciary obligation to its clients.

48.     With the onset in 2004 of the investigation by New York Attorney General ("A.G.") Elliott Spitzer ("Spitzer") into the use of contingent commission arrangements, Marsh did post a website (<http://www.msa.marsh.com>) to describe the Contingent Fee agreements. That website was itself misleading, however, since it failed to disclose the use of bid-rigging or fictitious quotes for Insurance Products. It also did not disclose that the true purpose of MSAs was to steer clients to those insurers who paid Marsh the most money. Moreover, the website asserted that MSAs compensate Marsh for services provided to insurers, allegedly including "streamlined access to clients," "intellectual capital," "product development," "development and provision of technology" and "administrative and information services." All of these "services," however, are services Marsh and MMC already had a fiduciary obligation to provide to clients. Moreover, any assertion that MSAs/PSAs compensate Marsh and MMC for the costs of providing such services is without merit. A 2004 report by J.P. Morgan Securities, Inc. ("Morgan") states that the profit margin for brokers on revenues from MSAs/PSAs is at least

70% and may be as high as 100%. The report concluded that "[w]e are hard-pressed to describe any material cost directly associated with these revenues."

49.    Marsh and MMC also made no systematic effort to disaggregate the revenues from these agreements, something Jeffrey Greenberg, its former CEO, admitted as recently as July 28, 2004 during a conference with market analysts. Only on October 18, 2004, after being sued by the State of New York in the lawsuit described below, was it disclosed that MMC's revenues from contingent commission arrangements were $845 million in 2003 (12% of MMC's risk and insurance revenue and 7% of total consolidated revenue) and $420 million for the first six months of 2004 (11% of MMC's risk and insurance revenue and 7% of its total consolidated revenue).

50.    Thus, while Marsh and MMC portrayed themselves as "advocates" for their clients who acted in "our client's best interest", by virtue of the practices described herein, they repeatedly and consistently acted against the best interests of their clients in order to maximize their own profits through unfair and unlawful competitive acts.

51.    The New York A.G.'s office has confirmed that the practices complained of in its complaint against MMC and Marsh described below are widespread and extend throughout the insurance industry. In a press release issued by that office on October 14, 2004, it was stated:

> [t]he actions against the brokerage firm, Marsh & McLennan Companies, and the two executives stem from a widening investigation of fraud and anti-competitive practices in the insurance industry. Evidence revealed in today's lawsuit also implicates other major insurance carriers.
>
> "The insurance industry needs to take a long, hard look at itself," Spitzer said. "If the practices identified in our suit are as widespread as they appear to be, then the industry's fundamental business model needs major corrective action and reform."
>
> "There is simply no responsible argument for a system that rigs bids, stifles competition and cheats customers," he added.

52.    In testimony given before the U.S. Senate's Governmental Affairs Committee on November 16, 2004, Spitzer further confirmed that "contingent commissions have affected practically every line of insurance business" including reinsurance.

53.     The 2004 J.P. Morgan report cited above likewise concluded that "contingent commissions comprise 5 percent of revenues and 15 percent of earnings for publicly traded brokers." In testimony given before the U.S. Senate's Governmental Affairs Committee on November 16, 2004, it was estimated that in 2003, industry-wide property/casualty contingent commissions totaled $4.2 billion.

54.     *The New York Times* reported on October 25, 2004 that a six-month probe of Aon uncovered "deceptive and coercive practices" and that the New York A.G.'s office may commence a civil lawsuit against Aon during the next few weeks, according to a source close to the inquiry. The article goes on to state:

> At Aon, the person close to the case said, investigators have found documentation of brokers steering business to insurers that paid the company incentives … They also found another anticompetitive practice known as tying, a kind of pay-to-play arrangement in which brokers threaten to curtail sales for an insurance company unless the insurer lets the broker also arrange its own coverage needs or reinsurance. Fees on reinsurance, which insurers buy to reduce their risk, can run into the tens of millions of dollars.

On October 31, 2004, the newspaper reported that Michael O'Halleran, Aon's President and head of its reinsurance unit, may have required insurers to buy reinsurance from that unit in exchange for placing their own coverage with Aon's customers.

55.     Aon has admitted the widespread use of what it called CSUs, identifying 82 insurers with whom it has such agreements, including many of the Insurer Defendants here. Aon, in response to the New York A.G.'s office's investigation, has created a website on the topic (<http://www.aon.com/about/csu/default.asp>), but, like Marsh's website, it fails to explain how CSUs are used to allocate customers to those insurers who provide greater payments to Aon. Aon's website also falsely states that CSUs compensate it for the costs of services supplied to insurers.

56.     In an October 28, 2004 press release, Aon admitted that it had received payments of contingent commissions totaling $117 million for the nine months ended in September of 2004. It also admitted that it received an additional $91 million during the same period for

"other compensation for services to underwriters." Aon announced on October 22, 2004 that it was ceasing to accept contingent commissions, an action brought about by the Spitzer lawsuit described below. It has not indicated any intention to cease accepting the "other compensation" described in its October 28 press release.

57.    Similarly, Willis announced for the first time, on October 21, 2004, that it obtained an estimated total of $160 million in 2004 from the use, *inter alia*, of contingent commission agreements. Willis also announced its intention to cease accepting contingent fees as of the date. As the J.P. Morgan report stated, Willis, along with Aon and MMC, had a practice of not disclosing such arrangements. Indeed, the Morgan report noted that under its CEO, Joe Plumeri, Willis was attempting to aggressively pursue such arrangements with insurers.

### B.    The Investigations And Prosecutions By The State Attorneys General

58.    On October 14, 2004, Spitzer filed a lawsuit against MMC and Marsh in New York state court, alleging that "[s]ince at least the late 1990s, Marsh has designed and executed a business plan under which insurance companies have agreed to pay Marsh more than a billion dollars in so-called 'contingent commissions' to steer them business and shield them from competition." One of the documents attached to Spitzer's complaint is a statement by Marsh indicating that "[a]ssignments of this type are commonplace in the industry and Marsh has them with almost all major insurers." As Spitzer's complaint further stated, "[t]he losers in all of this, of course, are Marsh's clients and the marketplace for insurance, which Marsh corrupted by distorting and elevating the price of insurance for every policy holder." Spitzer's complaint alleged, *inter alia*, violations of New York's laws prohibiting antitrust violations and fraudulent business practices.

59.    Spitzer's complaint provided extensive documentary materials obtained from Marsh and others that showed how this corrupt system worked. Among the ways in which it worked was bid-rigging, whereby Marsh would collude with insurance companies to have the latter submit false quotations, so that Marsh could steer the business for its customers to the

insurance company that submitted the ostensibly "lowest" bid. The insurance companies identified in Spitzer's complaint that participated in such bid-rigging included ACE Ltd., Hartford, MARP, and AIG. Examples of such bid-rigging and customer allocation, drawn from Spitzer's complaint against Marsh and MMC and the documents described therein, are set forth in detail below.

60.    In announcing his lawsuit on October 14, Spitzer said that the New York A.G.'s office had been misled in its investigation "at the highest levels of the company".

61.    MMC has responded to the filing of the Spitzer lawsuit by:

    a.    promising, in a press release dated October 14, 2004, to conduct an "independent review" of the accusations against Marsh;

    b.    having Jeffery W. Greenberg, its former Chairman and CEO, announce on October 15, 2004 that Ray Groves ("Groves"), Chairman and CEO of MMC, would be replaced by Michael Cherlasky ("Cherlasky"), formerly head of Marsh Kroll, MMC's risk consulting subsidiary;

    c.    announcing, on October 15, 2004, that, pending the completion of the New York Attorney General's ("A.G.") investigation, it was suspending the use of MSAs;

    d.    making public on October 18, 2004, for the first time, MMC's revenues from contingent commission agreements, as described above;

    e.    Announcing on October 25, 2004, that Jeffrey Greenberg had abruptly resigned as Chairman and CEO of MMC and would be replaced by Cherlasky;

    f.    Announcing on October 26, 2004, that it was instituting institutional reforms, including transparency to clients, and the permanent abolition of MSAs;

    g.    According to a November 4, 2004 *Wall Street Journal* article, dismissing Gilman and three other Marsh executives—Edward McNenney, Gregory

Doherty and Glenn Bosshardt. A fifth executive—Gilman's daughter, Samantha Gilman—has been suspended but is still in Marsh's employ.

h.     Announcing on November 8, 2004 that Roger E. Egan, President and Chief Operating Officer of Marsh, Christopher M. Treanor, Marsh's Chairman and Chief Executive Officer of Global Placement, and William L. Rossoff, Senior Vice-President and General Counsel of MMC, were resigning, thus confirming that the wrongdoing in Marsh and MMC was pervasive and occurred at the highest levels of both companies.

i.     Announcing on November 18, 2004 that five members of Marsh's Board of Directors—Mathis Cabiallavetta, Peter Coster, Groves, Charles A. Davis, and A.J.C. Smith—were stepping down so that the company could thereafter adhere to best corporate governance practices.

j.     Announced on January 7, 2005 that a new position of "Chief Compliance Officer" would be created, to be filled by Senior Vice-President E. Scott Gilbert.

62.     On January 6, 2005, the New York A.G.'s office announced that an unidentified Vice-President at Marsh had pleaded guilty to criminal charges of fraud in connection with the rigging of bids for insurance business. AIG, ACE, Zurich were among the insurers identified in the felony plea that had participated in these activities.

63.     The lawsuit against MMC and Marsh was not the only action undertaken by the New York A.G.'s office. Spitzer also announced on October 14, 2004 that two employees of the Excess Casualty unit of American Home Assurance Company, a subsidiary of AIG that provides excess liability insurance to businesses, pled guilty to charges of bid-rigging in connection with their dealings with Marsh. In published reports on the internet, the two are identified as Karen Radke, a Senior Vice-President, and Jean-Baptiste Tateossian, a manager.

64.     According to testimony before the U.S. Senate's Governmental Affairs Committee on November 16, 2004, during an industry conference held in late 2003, Maurice

Greenberg, its Chairman and CEO, said "[w]e absolutely need to hold the line on pricing and not give in to excessive competition."

65.    In addition, Patricia Abrams ("Abrams"), an Assistant Vice-President at ACE Ltd., pleaded guilty to committing improper practices. It has been reported that between 2002 and 2004 Abrams conspired with Marsh to submit false bids.

66.    As a result of Spitzer's investigation, AIG, through Maurice Greenberg, announced on October 15, 2004 that it had suspended, at least for the moment, the payment of incentive fees to insurance brokers. Similarly, on October 17, 2004, Evan Greenberg, ACE Ltd.'s President and CEO, announced that the use of PSAs was being discontinued.

67.    ACE further announced on November 4, 2004, that it was dismissing two employees—Abrams and Geoffrey Gregory, President of ACE Casualty Risk—for their involvement in improper activities relating to bids submitted to MGB. Three other employees who worked in ACE Casualty Risk on a team that did business with MGB were suspended.

68.    Also, on November 12, 2004, the *Wall Street Journal* reported that Hartford had fired two underwriters in its Los Angeles office for "not fully cooperating" with the investigation being conducted by the New York A.G.'s office.

69.    On November 12, 2004, the New York A.G.'s office filed a lawsuit against Universal Life Resources, d/b/a ULR, Universal Life Resources, Inc., d/b/a ULR Insurance Services, Inc., Douglas P. Cox ("Cox") (President and CEO of ULR) and a company (Benefits Commerce) of which Cox is the sole shareholder. In his press release announcing the filing of this lawsuit, Spitzer stated that "[t]oday's case demonstrates that the corrupt practices first laid bare in the Marsh suit are present in additional sectors of the industry . . . Secret payoffs and conflicts of interest that infected the market for property and casualty insurance have taken root in the employee benefits market as well." Further examples of bid-rigging and customer allocation, drawn from Spitzer's complaint against ULR, are set forth in detail below.

70.    The practices in question are not limited to MMC, Marsh, Hartford, AIG, ACE Ltd., ULR, and MARP.

71. MetLife admitted publicly on October 15, 2004 that it had received a subpoena from the New York A.G.'s office "seeking information regarding certain compensation agreements between insurance brokers and MetLife." MetLife has since received a second subpoena broadening the scope of that inquiry. More recently, MetLife received two additional subpoenas, which included a set of interrogatories, seeking information regarding whether MetLife has provided or is aware of the provisions of 'fictitious' or 'inflated' bids." Subsequently, on October 19, 2004, MetLife stated publicly for the first time that it earned $25 million on contingent commission arrangements in 2003. MetLife's unlawful conduct was further detailed in the New York A.G.'s office's November 12, 2004 complaint against ULR.

72. On October 15, 2004, NFP stated that it had

> received a subpoena from the Office of the Attorney General of the State of New York seeking information regarding placement service agreements. Since the receipt of the initial subpoena, NFP has received two additional subpoenas from the Attorney General's office seeking information as to whether it requested any insurance companies to provide fictitious or inflated quotes to clients or it intentionally misrepresented quotes to clients.

NFP went on to indicate that

> [t]o date, the Attorney General's investigation of NFP has focused on the activities of NFP's New York licensed property and casualty insurance brokers. The ultimate scope and outcome of the Attorney General's investigation cannot be determined at this time
> . . . .

73. On October 19, 2004, UnumProvident announced that the New York A.G.'s office had served subpoenas upon it, seeking information as to both its use of contingent commission agreements and "information regarding its quoting process." UnumProvident's unlawful conduct was further detailed in the New York A.G.'s office's November 12, 2004 complaint against ULR.

74. On November 16, 2004, it was announced that two senior underwriters at ZNA's Specialty Excess Casualty Unit had pleaded guilty to criminal charges of rigging bids for

insurance in conjunction with MGB. The press release announcing this development stated that the two employees "admitted to following and executing the directions from a supposedly neutral broker to submit bids designed to lose, thus awarding the business to the designated 'winner.'" According to testimony before the U.S. Senate's Governmental Affairs Committee on November 16, 2004, during the aforementioned industry conference held in late 2003, James Schiro, CEO of Zurich Financial Services, said to his counterparts at other insurers "[l]et's not get pulled into a soft market. We are not ready for a soft market and cannot afford one. . . . Let's not get in a race for marketshare . . . we need several more years of profitability." This theme was emphasized again and again by CEOs speaking at the meeting.

75.     On October 25, 2004, St. Paul announced that it had received a subpoena from the New York A.G.'s office "relating to the conduct of business between insurance brokers and St. Paul Travelers and its subsidiaries."

76.     At least one Insurance Broker has publicly acknowledged, via filings with the Securities and Exchange Commission, that it received contingent commissions based on the increased profits and/or volume of business enjoyed by the underwriting insurance firms and occasionally shared such commissions with other brokers.

77.     It has further been reported that Connecticut Attorney General Richard Blumenthal is conducting his own investigation of the industry and is considering filing lawsuits of his own. On November 12, 2004 it was reported in the *Wall Street Journal* that the Blumenthal's office had issued subpoenas to 42 of the nation's largest insurers and insurance brokers requiring those firms to identify any instances of fake bids since the beginning of 1998. Hartford has also reported receiving a subpoena from the Florida Attorney General. Similarly, on November 18, 2004, California's Department of Insurance initiated a lawsuit in state court under California's insurance laws against ULR, Cox, MetLife, UnumProvident and others for fraudulent practices as described herein.

C.    **The Practices Revealed In The New York Attorney General's Complaint Against Marsh and MMC**

      1.    **Marsh Steered Clients to Insurers that Paid Favorable Contingent Commissions**

78.    In the late 1990s, Marsh began internally rating the insurance companies with whom it dealt based on how much they paid Marsh pursuant to their contingent commission agreements. In February of 2002, a managing director of the Healthcare group of MGB (which, as noted above, oversaw policy placement decisions in Marsh's major business lines) provided nine of his colleagues with a list of the insurance companies that were paying Marsh pursuant to contingent commission agreements. He cautioned, however, that "[s]ome [contingent commission agreements] are better than others," and said that soon, Marsh would formally "tier" the insurance companies. He went on to state that "I will give you clear direction on who [we] are steering business to and who we are steering business from."

79.    A "tiering report" was later circulated to MGB executives, which listed insurance companies in tiers depending on how advantageous their agreed-upon contingent commissions were to Marsh. The instructions to the managers who received the list included a direction that they were to "monitor premium placements" to assure that Marsh obtained "maximum concentration with Tier A & B" insurance companies, those with contingent commission agreements most favorable to Marsh. In a September 2003 e-mail, an MGB executive was even more direct: "We need to place our business in 2004 with those that have superior financials, broad coverage and pay us the most."

80.    Marsh executives have issued directions about specific companies as well. For example, in April of 2001, an MGB managing director in the Excess Casualty group in New York wrote to the heads of regional centers, asking for "twenty accounts that you can move from an incumbent [insurance company]" to a company that had just extended its contingent commission agreement. She warned, however, "You must make sure that you are not moving

business from key [contingent commission companies]." Carrying out this directive, she concluded, "could mean a fantastic increase in our revenue."

81.    The benefit of the steering system to the paying insurance companies was clear. In July of 2000, an MGB executive wrote to four of her colleagues to discuss "BUSINESS DEVELOPMENT STRATEGIES" with a particular "preferred" insurance company that had signed a contingent commission agreement with Marsh. In describing what Marsh had done for that company, she wrote, "[t]hey have gotten the 'lions [sic] share' of our Environmental business PLUS they get an unfair 'competitive advantage['] as our preferred [sic] [insurance company]."

82.    Marsh was explicit with insurance companies about how contingent commission agreements more favorable to Marsh would result in Marsh selling more of their policies. For example, an MGB executive recounted in an e-mail dated November 7, 2003 about how he told the president of ACE USA that she could meet her firm's sales goals by agreeing to a larger contingent commission agreement: "I made it clear that if ACE wants us to meet significant premium growth targets then ACE will have to pay 'above market' for such [a] stretch. . . ." Marsh also threatened to "kill" the company if it did not "get to [the]right number" on the contingent commission agreement.

83.    Marsh recognized and rewarded employees who "moved" clients to insurance companies with contingent commission agreements. For example, in February of 2003, a Marsh Senior Vice-President in the MGB's Healthcare Group nominated a subordinate to become a Vice-President. On the nomination form, under the heading "Financial Success," he noted that the nominee had increased Marsh's revenue "by moving" a renewing client to an insurance company with a contingent commission agreement. He concluded, "[n]eighborhood Health Partnership Estimated Revenue - $390,000." That nominee's 2002 performance review similarly noted that the nominee "was responsible for the renewal of a large HMO in Miami and was successful with placing of this account with a [contingent commission insurance company]— increased revenue from $120,000 to $360,000 (estimated)." A 2003 self-appraisal form by that

same nominee—now a Vice-President—stated that he "[r]enewed large account with [contingent commission insurance company] to demonstrate our willingness to continue our relationship. Moved a number of accounts to [contingent commission agreement carriers] for the sole reason to demonstrate partnership." Other employees were similarly praised in performance evaluations for increasing Marsh's contingent commission income from insurance companies "by achieving budgeted tiering goals".

84.     Conversely, Marsh employees have been criticized for bucking the system. Initially, when Marsh began signing national contingent commission agreements, MGB not only negotiated all of the agreements, but also kept all of the revenue. Many of Marsh's local and regional offices, which had previously had their own contingent commission agreements with insurance carriers, resented the loss of revenue to the central MGB office and refused to have MGB pass on all of their placements. Eventually, MGB initiated a "revenue repatriation" program under which some of MGB's national contingent commissions were shared with local and regional offices. In June 2003, the head of MGB's Excess Casualty group wrote to an employee in Marsh's Seattle office to chastise her for placing insurance directly with a carrier on behalf of a client, thus denying a contingent commission to MGB: "[t]he GB repatriation dollars are no small component of your office's budget. You have lowered that amount with this placement. You may want to consider this in the future."

85.     Marsh also entered into contingent commission agreements that created incentives to favor the incumbent carrier when a policy came up for renewal. At the time of a renewal, Marsh's clients expect it to give unbiased advice on whether to stay with the incumbent or sign with a new carrier. Meanwhile, incumbent insurance companies have paid Marsh to recommend their own renewals. For example, a 2003 contingent commission agreement with AIG Risk Management, Inc. ("AIGRMI") provided Marsh with a bonus of 1% of all renewal premiums if its clients renewed with AIGRMI at a rate of 85% or higher. If the renewal rate was 90% or higher, Marsh received 2% of the renewal premium, and if the rate was 95% or higher, Marsh received 3%. Marsh even negotiated (though it ultimately did not enter into) a $1 million "no

shopping" agreement whereby Marsh would have recommended to its top individual clients who had bought personal insurance policies from Chubb Insurance that they renew those policies.

### 2. Marsh's Bid-Rigging Practices With Insurers

86. On many occasions, insurance companies colluded with Marsh to rig bids and submit false quotes to unwitting clients throughout the United States. The following are examples only and are not meant to be all-inclusive. All of the conduct described below was undertaken in furtherance of the conspiracy by the Insurance Broker Defendants and Insurer Defendants to allocate customers and utilize PSAs/MSAs on an industry-wide basis.

### a. AIG

87. Among AIG's lines is excess insurance that covers losses over and above the amounts covered by the insured's primary insurance policies. Beginning in or around 2001 until at least the summer of 2004, MGB's Excess Casualty Group and AIG's American Home Excess Casualty Division (AIG's principal provider of commercial umbrella or excess liability and excess worker's compensations insurance) engaged in systematic bid manipulation.

88. When AIG was the incumbent carrier and a policy was up for renewal, Marsh solicited what was called an "A Quote" from AIG, whereby Marsh provided AIG with a target premium and the policy terms for the quote. If AIG agreed to quote the target provided by Marsh, AIG kept the business, regardless of whether it could have quoted more favorable terms or premium.

89. In situations where another carrier was the incumbent, Marsh asked AIG for what was variously referred to as a "backup quote," "protective quote" or "B Quote," telling AIG that it would not get the business. In many instances, Marsh provided AIG with a target premium and the policy terms for these quotes. In these cases, it was understood that the target premium set by Marsh was higher than the quote provided by the incumbent, and that AIG should not bid below the Marsh-supplied target. For example, in October of 2003, an underwriter at AIG described a particular quote that he had provided as follows: "[t]his was not a real opportunity. Incumbent Zurich did what they needed to do at renewal. We were just there in case they

defaulted. Broker ... said Zurich came in around $750K & wanted us to quote around $900K."
Even when AIG could have quoted a premium lower than the target, it rarely did so. Instead
AIG provided a quote consistent with the target premium set by Marsh, thereby throwing the bid.

90.     In other instances, Marsh asked AIG to provide B Quotes where AIG was not
supposed to get the business, but Marsh did not set a particular premium target. In these
instances, AIG looked at the expiring policy terms and premium and provided a quote high
enough to ensure that: (a) the quote would not prevail, and (b) in the rare case where AIG did
get the business, it would make a comfortable profit. One example was reflected in a
communication by the former Marsh executive who pled guilty on January 5, 2005 to a
colleague, William McBurnie, where it was stated: "Chubb have quoted lead renewal at . . .
$135,000. Would you please have AIG provide a B." The same executive said in a related e-
mail: "[a] 'B' would be a quote from AIG which is higher in premium and more restrictive in
coverage, thus supporting the Chubb quote."

91.     In B Quote situations, AIG did not do a complete underwriting analysis. In those
few situations when AIG inadvertently won B Quote business (because the incumbent was not
able or willing to meet Marsh's target), AIG personnel would "back fill" the underwriting work
on the file—that is, prepare the necessary analysis after the fact.

92.     Finally, Marsh came to AIG for a "C Quote" when there was no incumbent carrier
to protect. Although Marsh often provided premium targets in these situations, it was understood
that there was the possibility of real competition.

93.     On October 29, 2003, the former Marsh executive who pled guilty to felony
charges in January of 2005 sent an informational e-mail to five of his colleagues at MGB,
attaching a document that outlined some of the "very specific protocols on how we place
business...." The document states; "[r]equest 'B' quotes early b/c last week of every month
markets only focus on 'live' opportunities vs. quoting B's (careful that alternative 'B' doesn't
beat incumbents quote—it's not always price, it could be attachment point or coverage)."

94.     The "A, B, C" quote system was strictly enforced by Marsh through Gilman, the Executive Director of Marketing at MGB mentioned earlier. Gilman refused to allow AIG to put in competitive quotes in B Quote situations, and, on more than one occasion, warned that AIG would lose its entire book of business with Marsh if it did not provide B Quotes. Gilman likewise advised AIG of the benefits of the system. As he put it, Marsh "protected AIG's ass" when it was the incumbent carrier, and it expected AIG to help Marsh "protect" other incumbents by providing B Quotes.

### b.     ACE

95.     ACE USA is part of a group of subsidiaries under ACE. In 2002, ACE USA decided to enter the excess casualty market by creating a separate division, called the Casualty Risk Department. ACE USA signed a contingent commission agreement in order to gain access to the business Marsh controlled. ACE USA also repeatedly provided the same type of B Quotes that AIG provided.

96.     The B Quotes given to Marsh were often in amounts requested by Marsh, even though a lower quote would have been justified by an underwriting analysis. As ACE USA's President of Casualty Risk summarized:

> Marsh is consistently asking us to provide what they refer to as 'B' quotes for a risk. They openly acknowledge we will not bind these 'B' quotes in the layers we are be [sic] asked to quote but that they will work us into the program' at another attachment point. So for example if we are asked for a 'B' quote for a lead umbrella then they provide us with pricing targets for that 'B' quote. It has been inferred that the 'pricing targets' provided are designed to ensure underwriters 'do not do anything stupid' as respects pricing.

In this same e-mail, ACE USA's executive wrote that he "support[ed]" Marsh's business model, which he described as "unique."

97.     An example of the operation of this system is evident in the bidding for the excess casualty insurance business of Fortune Brands, Inc., a holding company engaged in the manufacture and sale of home products, office products, golf products, and distilled spirits and wine. On December 17, 2002, an ACE USA Assistant Vice-President of underwriting sent a fax

to Greg Doherty ("Doherty"), a Senior Vice-President in MGB's Excess Casualty Division,
quoting an annual premium of $990,000 for the policy. Later that day, ACE USA revised its bid
upward to $1,100,000. On the fax cover sheet with the revised bid, ACE USA's Assistant Vice-
President wrote: "[p]er our conversation attached is revised confirmation. All terms &
conditions remain unchanged." In an e-mail the next day, the Assistant Vice-President to an
ACE USA Vice-President of Underwriting explained the revision as follows: "[o]riginal quote
$990,000 ... We were more competitive than AIG in price and terms. MMGB requested we
increase premium to $1.1M to be less competitive, so AIG does not loose [sic] the business. ..."

98.     As another example, in a March 5, 2003 e-mail, Josh Bewlay, head of MGB,
directed the former Marsh executive who pled guilt to felony charges in January of 2005 to "get
the quote from Pete. AIG was to hit 25 percent increase. Then we need B quotes at the expiring
attachments." Further e-mails reflect that Zurich, ACE, and St. Paul subsequently offered losing
quotations on the account. In one, Doherty sent ACE underwriter James Williams on March 17,
2003 an e-mail instructing him as follows: "need a 'B' for shits and giggles." The client renewed
the insurance policy with AIG.

99.     This arrangement benefited both to Marsh and ACE USA. As Doherty wrote in a
June 20, 2003 e-mail to the same ACE Vice-President: "Currently, we have about $6M in new
business [with ACE USA] which is the best in Marsh Global Broking so I do not want to hear
that you are not doing 'B' quotes or we will not bind anything."

100.     The bidding process for excess casualty insurance for Brambles, USA, a
manufacturer of commercial industrial pallets and containers (among other products), further
demonstrates the bid-rigging scheme. In June of 2003, ACE USA learned that Brambles was
unhappy with the incumbent carrier. Despite this, Marsh asked ACE USA to refrain from
submitting a competitive bid because Marsh wanted the incumbent, AIG, to keep the business.
An ACE USA Vice-President of Underwriting wrote to the ACE USA President of Risk and
Casualty:

> Our rating has a risk at $890,000 and I advised MMGB NY that we
> could get to $850,000 if needed. Doherty gave me a song & dance

that game plan is for AIG at $850,000 and to not commit our ability in writing.

101.    ACE USA continued to provide Marsh with inflated quotes in 2004.

### c.    **Hartford**

102.    Marsh also engaged in bid-rigging conduct with Hartford with respect to Marsh's "Middle Market" and small business clients.

103.    Middle Market insurance provides coverage for companies where the annual premium ranges from tens of thousands of dollars to around $1 million. Hartford became a "partner market"—meaning it agreed to pay contingent commissions—with Marsh's so-called Advantage America program in July of 2003. The Advantage America program was developed by Marsh to fold its small commercial property/casualty business into its Middle Market group. With annual premiums in the range of $25,000 to $200,000 dollars, this program provided coverage to small businesses. Marsh centralized all of this small business insurance placement in an office in Lake Mary, Florida, near Tampa.

104.    Hartford was given the advantage of office space in Marsh's Lake Mary facilities. On numerous occasions during 2003 and 2004, Marsh employees asked the two Hartford underwriters assigned to this facility, either in person or by telephone, to provide an inflated quote or "indication" (non-binding proposed price) for insurance coverage for a small business. Typically, Hartford's underwriters were told to price the quote or indication 25% above a particular number, and that by doing so Hartford need not worry that it would get the business. Hartford colluded in the scheme.

105.    Marsh did not restrict its bid rigging in the Middle Market to small businesses. Marsh's Los Angeles area MGB office handled larger Middle Market risks with annual premiums reaching $1 million. The Marsh Los Angeles office is in the same office building as Hartford's. Starting as far back as 2000, Marsh employees, on virtually a daily basis, asked Hartford for inflated quotes or indications in a manner similar to the process described above for the Florida facility. In Los Angeles, however, Marsh often provided Hartford with a spreadsheet

showing the accounts for which it wanted Hartford to provide a losing quote or indication, along with other insurers' quotes. It instructed Hartford to quote some percentage, typically 25%, above the other insurers' quotes on the spreadsheet to ensure that Hartford would not get the business. These were referred to as "Throwaway Quotes." Hartford provided the inflated quotes.

106. On even larger risks in Southern California, those of over $1 million of annual premium, Marsh similarly asked for inflated quotes or indications, also providing spreadsheets containing other insurers' quotes to Hartford. Hartford provided these quotes as well. Hartford provided these quotes and indications because Marsh was its biggest broker, and it felt that Marsh would limit its business opportunities if it refused.

### d. **MARP**

107. As of 2001, MARP had entered into separate contingent commission agreements with Marsh's Excess Casualty, Property, FINPRO (Financial Products) and Health Spectrum Groups. MARP adjusted its rates to pass the costs of these agreements on to its clients. When pricing Marsh business, MARP determined the base premium for the policy, added a percentage to reflect the expected contingent commission and sent the quote to Marsh.

108. In 2000, MARP disclosed the existence of its contingent commission agreement with Marsh to a significant client to explain the contingent commissions that were being passed on to the client. Marsh was furious, and chastised Munich. A Senior Vice-President at MARP apologized to Marsh in an e-mail: "[w]e acknowledge that this was inappropriate behavior ..." He told Marsh that MARP would "do the necessary to eliminate all documentation, electronic or otherwise, that references or otherwise alludes to the [contingent commissions]. I apologize for the consternation that this has caused within the Marsh organization."

109. Throughout 2001 and early 2002, the MGB Excess Casualty Group repeatedly requested that MARP provide "favors" designed to assist Marsh in its bid rigging process. These "favors" included:

a.  Requests to submit "false quotes" to allow Marsh to manipulate market pricing and present other carriers' quotes in a more favorable light;

b.  A request on a particular account that MARP either decline the risk altogether or submit a quote higher than the incumbent quote;

c.  Requests that MARP not bid on a renewal because Marsh owed the incumbent a favor and didn't want Munich to come in with a lower quote; and

d.  A request for an artificially inflated initial quote so that Marsh could look good to the client when it "negotiated" the quote down.

110. Throughout 2001, Marsh also asked MARP to act as "back-up or wait in the wings" at several client presentations. It was, in other words, asking MARP to attend presentations for prospective clients with whom Munich was already out of the running. One Munich regional manager characterized these presentations as mere "Drive bys." For example, in 2001, Marsh sent MARP an e-mail request explaining that it "needed to introduce competition" at a prospective client presentation and needed Munich to send a "live body." Frustrated with Marsh's continuous requests for "live bodies," one MARP regional manager responded, "WE DON'T HAVE THE STAFF TO ATTEND MEETINGS JUST FOR THE SAKE OF BEING A 'BODY.' WHILE YOU MAY NEED 'A LIVE BODY", WE NEED A 'LIVE OPPORTUNITY.'"

111. These business practices were known to MARP's management. In preparing for an April 2001 meeting with Marsh, a Senior Vice-President solicited reactions from his regional managers regarding their experiences with Marsh Global Broking. He then cut and pasted the managers' comments into a single document and circulated it to them for discussion. Complaints and reactions from the MARP's regional managers included:

> I am not some Goody Two Shoes who believes that truth is absolute but I do feel I have a pretty strict ethical code about being truthful and honest with people. And when I told [sic] I have to say certain things I know to be untrue to people I respect and have known for a long time, it is not what I feel I should be asked to do of [sic] what this company stands for. Yet it has already happened

several times and I have either had to dodge the client and broker on the issue, which won't always work, or risk making GB [MGB] angry by telling a carefully edited version of the truth, which was more than they wanted out but less than satisfying to the client or broker.

This idea of "throwing the quote" by quoting artificially high numbers in some predetermined arrangement for us to lose is repugnant to me, not so much because I hate to lose, but because it is basically dishonest. And I basically agree with the comments of others that it comes awfully close to collusion or price fixing.

WHAT ARE THE RULES ON PRICING—ARE WE TO QUOTE OUR NUMBERS OR WHAT MGB [MARSH GLOBAL BROKING] WANTS US TO QUOTE—HOW DOES THEIR INTERNAL PREFERRED MARKET THING WORK?

### e.    <u>Zurich</u>

112.    Zurich also provided fictitious quotations to Marsh. For example, in a March 11, 2003 e-mail to April Greenwood ("Greenwood"), a Marsh broker, the Marsh executive who pled guilty to felony charges in January of 2005 said: "[c]an you get me a B from Zurich. Client will be binding with [incumbent] St. Paul at $270,000 all coverages as expiring. $325,000 should work." Later that day, in another e-mail, the same executive reiterated his request to Greenwood to "have them issue a B on the lead at $325,000 or more." The next day, an underwriter at Zurich provided a $360,000 quotation to Marsh.

### f.    <u>The Greenville County School Project</u>

113.    Marsh's involvement with the Greenville, South Carolina Public School District illustrates how Marsh both abused its fiduciary role in an attempt to secure a contingent commission agreement with an insurance company and rigged the bidding process.

114.    In the 1990's, Greenville County, South Carolina experienced unanticipated student growth beyond the capacity of then existing facilities for the 62,000 school children in the district. In addition, many of the existing schools needed extensive renovations. The school district, through a non-profit corporation named BEST (Building Equity Sooner for Tomorrow), raised $800 million by selling bonds to fund the renovation, expansion, and new construction of

fifty-five school facilities (the "Greenville project"). BEST hired Institutional Resources, LLC ("Institutional Resources") as the program manager and procurement agent for the project. As part of its responsibilities, Institutional Resources had to procure insurance coverage for the project.

115.    Lacking expertise in insurance, Institutional Resources hired Marsh after conducting a search and evaluating broker proposals. For its role in the Greenville project, Marsh was to be paid approximately $1.5 million.

116.    During the bidding process, there were two serious bidders who competed for the business: Zurich North America ("Zurich") and ACE USA. Unbeknownst to Greenville, however, while this bidding process was ongoing, Marsh held out the Greenville project as a "carrot" in its effort to entice Zurich to sign a contingent commission agreement. In a December 12, 2002 email, Joan Schneider ("Schneider"), an MGB executive, explained to Zurich:

> [Y]ou are currently in the running on Greenville Country [*sic*] School System (FIX cost near 3MM) ... neck and neck with ACE who we have a PSA with . . . Will bind most likely after the first of the year . . . where are we on the [contingent commission] agreement . . . Left messages but haven't heard from you ... hint hint.

117.    Between the December 12, 2002 email and the award of the contract on January 3, 2003, the contingent commission negotiations progressed and the project was awarded to Zurich. Although Zurich and Marsh never entered a contingent commission agreement, Marsh made clear its view of the linkage:

> [p]er our conversation today, (sorry to call you during your vacation) the good news is that we are binding Greenville County School with you today!!!!!! We worked hard to get this to you and as we discussed expect it to be part of the [contingent commission] agreement. On your return Monday, I hope you and your regional folks can get this ironed out . . . this is a great start to the New Year and would like to keep it going.

118.    As part of its vigorous effort to steer the Greenville contract to Zurich, Marsh sought a false bid from a competing insurer and then, despite that insurer's refusal, submitted a

wholly fictitious bid on that insurer's behalf. On December 16, 2002, Glenn R. Bosshardt ("Bosshardt"), the MGB vice-president assigned to the project and Schneider's subordinate, contacted an assistant vice-president of underwriting at CNA, an individual with whom he had previously worked and who had already told Bosshardt that CNA had no interest in bidding on the Greenville project. In an e-mail, Bosshardt stated:

> [P]er my voicemail, we need to show a CNA proposal. I will outline below the leading programs (ACE & Zurich). I want to present a CNA program that is reasonably competitive, but will not be a winner.

Bosshardt proceeded to reveal the ACE and Zurich quotes on the project and then proposed numbers that CNA should quote in order to lose the bid but still appear to have been competitive. Although CNA never authorized Marsh to submit this bid, it was submitted to Institutional Resources as a legitimate competing bid.

119. Notably, Marsh—at a time when the prospect for a contingent commission agreement with Zurich remained real—advised Institutional Resources that Zurich was a superior company and should be awarded the bid. Marsh did not disclose to Institutional Resources either that it was seeking a contingent commission agreement from Zurich, or that it had falsely submitted a bid under CNA's name. Institutional Resources followed Marsh's recommendation and awarded the project to Zurich.

120. Even though Zurich and Marsh never entered into the [contingent commission] agreement, in his 2003 performance review, Bosshardt was praised for having "assist[ed] in the implementation of MGB's excess liability strategy to maximize contingent commission revenue."

### D. The Practices Revealed In The New York Attorney General's Complaint Against ULR

#### 1. ULR Receives Undisclosed Override Payments

121. ULR entered into secret override payment arrangements that created potential and actual conflicts with the interests of its clients. The arrangements create extraordinary incentives

for ULR to drive business to particular insurers: if a single ULR client moves from one insurer to another, ULR could lose millions of dollars in compensation. For example, under ULR's 2003 "special producer agreement" with UnumProvident, ULR would obtain "[e]xtra [c]ompensation" only if, among other things, it maintained 90 percent of the book of business it had the previous year with UnumProvident. ULR's persistency rate for the year was 91.48 percent. Had it dropped a mere 1.5 percent, ULR would have lost its entire annual override payment for persistency from UnumProvident in the amount of $1.27 million.

122.    The incentives are equally compelling for the insurers. It is understood that ULR will only direct business to insurers if they participate in override arrangements. In the words of a UnumProvident underwriter: "[u]nfortunately, to play with [ULR], we need the over-rides." As another UnumProvident employee elaborated, UnumProvident enters into override agreements with ULR because it represents one of the "biggest premium opportunities" and UnumProvident would get "0" of that business if it did not join ULR's club.

123.    Given this perception, MetLife, the nation's largest life insurer, paid ULR $9 million, or over 36 percent of its $25 million override budget in 2003—a remarkable figure given that Met had override agreements with at least 60 brokers.

124.    ULR's clients, however, never know that the placement or renewal of their employees' insurance coverage might mean the difference between a substantial payday for ULR or no payday at all. To the extent ULR even mentions overrides to its clients, it fails to meaningfully disclose the substance of the agreements, or how ULR generates substantial income from them. ULR has never explained to clients how overrides and other undisclosed payments might influence its professional advice so that clients could make informed decisions about their interaction with ULR.

125.    On the rare occasions that ULR has made disclosures, such disclosures have been misleading. For example, in a March 2004 agreement for consulting services with Sun Healthcare Group, Inc. ULR disclosed that it could receive an override payment, but the agreement does not explain that ULR's receipt of override payments are based on whether

business is placed with a particular carrier. Furthermore, ULR incorrectly states that its compensation will not exceed one percent of premium, when in fact, ULR's agreements allow for greater compensation.

## 2. ULR Receives "Communication Fees" From Unsuspecting Employees

126. In addition to receiving undisclosed payments from overrides, starting at least as early as 1998, ULR devised ways to generate additional revenues: it began charging fees for vague and ill-defined services. For example, ULR began charging fees such as "RFP fees," "enrollment fees" and "finder's fees," among others. While the RFP fee is a one time fee that the insurer pays during the RFP preparation process, the other fees remained undefined and were demanded on an ad hoc basis. ULR's receipt of these fees remained largely undisclosed to the clients and often lacked documentation of the services rendered. As one UnumProvident executive noted:

> In the past year, we have paid Doug Cox/ULR several million dollars and we don't have a lot of formal documentation other than email messages & invoices.

127. A Prudential executive likewise questioned: "I can't believe that we would pay anybody $513,000 . . . on a handshake."

128. In or about 1999, ULR began to aggressively promote its "communication services," specifically the "writing, designing and printing" of informational material about benefits plans. The fees for this service and the distribution of such materials to plan participants were typically charged at the rate of $10 per employee and $5 per employee for supplemental life and disability benefits, respectively.

129. The communication fees have become highly lucrative for ULR. In 2003, the $5.6 million ULR received for "communication" services represented over 20 percent of its total revenues for the year.

130. Given the lucrative nature of these fees, it is not surprising that ULR often conditions the placement of employers' insurance business only with those insurers who are prepared to use ULR's communications services. Although UnumProvident, Prudential and

MetLife regularly provide such services at a lower cost themselves or can obtain them more cheaply from other vendors, each has regularly advanced communication fees to ULR for such services based on the above rates. A former ULR employee analogized ULR's pricing for communication fees to "paying $300,000 for a Mercedes." UnumProvident paid ULR $3.5 million in communication fees from 2000 to 2003, which it has admitted were "excessive" and "outrageous."

131.     But the insurers themselves do not absorb these "outrageous" costs. Rather, ULR agrees with insurers that ULR's fees will be built into the premiums charged to employees who purchase supplemental insurance. Indeed, MetLife's 2002-03 compensation agreement with ULR explicitly required MetLife to pay such fees, and mandated that they "be included in [MetLife's] rates charged to employees." ULR's clients—whose employees ultimately paid the costs—were never consulted or notified about this hidden charge or its origin.

### 3.    ULR Conceals the Communication Fees and Override Payments it Receives From Insurers

132.     Cox and ULR have not only failed to disclose to their clients the additional compensation they receive from insurers; they have actively concealed and misrepresented it.

133.     ULR instructs insurers not to disclose its override compensation or other fees. Thus, in February 2003, while soliciting a bid from Prudential to place a group life policy for Brinker International, Inc., a restaurant chain of 1,400 stores and 90,000 employees, ULR expressly cautioned Prudential that "[c]ommunications fees ... should not be communicated to the client with ULR's prior consent."

134.     The documentation that ULR provided to clients often has misrepresented the nature of the compensation ULR is to receive. For example, in 2002, Safeway, Inc. ("Safeway"), which operates a chain of over 1,800 grocery stores in North America and has nearly 200,000 employees, retained ULR. ULR's agreement with Safeway—like certain other ULR agreements—states that the insurer will pay a $50,000 fee for RFP, and that the costs of ULR

"implementing and communicating the new plan" are "included in the RFP cost." In fact, for this plan, ULR levied a communication fee of $10 per employee for supplemental life insurance and $5 per employee for supplemental disability insurance, which was passed to employees through higher premiums. Altogether, ULR has received a total of $500,000 in undisclosed communication fees on this account, notwithstanding its prior representation to Safeway.

135.   ULR makes similar misrepresentations about its override agreements. Despite the fact that ULR had overrides agreements with a number of insurers in 2003, the language in its form contracts with clients stated: "ULR shall accept no compensation of any kind whatsoever from any insurance company, underwriter or brokerage firm relating to the services ULR is providing to [the client]."

136.   Even when clients specifically request fee information, ULR endeavors to conceal and misrepresent relevant facts. When, in 2004, United Parcel Service, Inc. ("UPS") asked Prudential about the details of overrides it had paid to ULR, Cox approved the following response:

> Prudential has an insurance producer incentive compensation program for group products and ULR participates in the program. The program costs are absorbed by Prudential as overhead and not allocated on a case-specific basis.

137.   The letter did not disclose:  1) that ULR also received communications and other fees from Prudential on the UPS account; and 2) that the insurer could calculate the precise amount of the override compensation to be paid to ULR that was attributable to its contract providing insurance coverage to UPS employees.

138.   ULR also conceals these secret compensation arrangements by mandating that they not be reported by insurers on the Schedule A. Until 2004, for example, ULR had a written agreement with UnumProvident providing that ULR's override compensation "[would] not be reflected on [Schedule A] reports." ULR has insisted that its communication fees also not be disclosed on these forms, and has told insurers that it will cease to do business with them should they disclose these fees.

139.    As a result of UnumProvident and other insurers "struggling with [ULR's] request to pay non-reportable fees" to ULR, in May 2004, Cox revived a dormant corporation named Benefits Commerce as a vehicle to receive communication fees. Benefits Commerce is wholly owned by Cox, and is managed by the same individual who provided the identical services for ULR. Cox's admitted purpose in creating this new arrangement was to avoid having UnumProvident report ULR's communication fees.

### 4.    ULR Favors Insurers that Cooperate

140.    The big payoff for insurers who participate in these arrangements is that, despite the appearance of a competitive process, they know that Cox often identifies an insurer as suited for a particular piece of business even before he issues the RFP on behalf of the client. Membership in Cox's club puts those insurers on the inside track to the business.

141.    In one agreement, ULR dropped all pretense of objective selection. Under a "Preferred Broker Compensation Plan II" agreement between ULR and MetLife, in effect in 2002 and 2003, ULR could secure a 50 percent increase in its overrides, ostensibly in exchange for certain ill-defined "administrative services" if ULR met a "New Business threshold." In order to meet such a threshold, ULR would have to give MetLife one of every three cases that MetLife priced "competitively." Thus, unbeknownst to his clients, Cox stood to gain yet additional compensation if he successfully steered accounts in keeping with the conditions laid down in that agreement.

142.    The pay-to-play arrangements also had other anti-competitive effects. Even when certain favored insurers could not compete on price, they could still obtain business. ULR was explicit about this trade-off, telling UnumProvident that because its new pricing was not competitive, UnumProvident would "need to comp[ensate] them [ULR] not to shop in force accounts[]." In other words, UnumProvident would have to meet ULR's demands for an override payment if it wanted to retain the insurance policies placed by ULR's clients. Indeed, a UnumProvident underwriter advised his supervisors that it would be worth "pay[ing] a slightly higher % [of override to ULR] for retaining profitable life cases—[since] this may be a less

expensive way to maintain some of these accounts (vs. going head-to-head with Met & Pru on price right now)."

143. While favoring certain insurers, Cox simultaneously will not deal with those that will not agree to the club's membership terms. In 2002, ULR and Minnesota Life Insurance Company ("Minnesota Life") reached an agreement on override payments, but Minnesota Life insisted that all of ULR's compensation be disclosed to the client. ULR refused to enter into the agreement and declined to engage in further business with Minnesota Life. Cox specifically told Minnesota Life that, all other things being equal, he would never recommend to a client the award of a bid to Minnesota Life in the absence of an override arrangement between ULR and Minnesota Life.

144. Aetna, Inc. ("Aetna"), one of the nation's largest life insurers, has not had an override agreement with ULR since February 2001. Since that time, Aetna has had virtually no success in securing new business where ULR is the broker. Ultimately, Aetna stopped providing quotes to ULR, in part because of what it deemed a "lack of objectivity in the bid process." The only solution, recommended by one Aetna employee who was familiar with ULR's business model, was:

> to put a competitive bonus program together for ULR. In addition,
> we need to have underwriting on board with pricing business
> *including their RFP and marketing fees.* (emphasis added).

145. ULR has even gone so far, as set forth in more detail below, to solicit a fictitious bid from another insurer in order to keep Aetna out of the final stage of competition on an account.

### 5. Examples of ULR Cheating Clients

146. ULR's practices have had a detrimental impact on its clients and their employees, as set forth below.

### a.     Viacom: ULR conspires to falsify documents

147.    Viacom Inc. ("Viacom"), is an international media company based in New York City, with over 122,000 employees. In 2004, Viacom retained ULR in connection with renewing its group life and accident employee insurance coverage with Prudential. Through ULR, Viacom requested Prudential to provide a renewal quote. In conjunction with creating its presentation of Prudential's renewal quote, ULR asked Prudential to create exhibits which misrepresented that Prudential's cost for communication services would be the same as ULR's costs. As previously stated, ULR generally charges $10.00 per employee for communication services. In contrast, when Prudential charges for the same services, it charges $3.45 per employee, although it ordinarily absorbs the cost in its overhead. Prudential employees resisted ULR at first, but ULR insisted that Prudential provide it with the false exhibits.

148.    Prudential provided ULR with the false exhibits, knowing that ULR intended to pass them on to Viacom. ULR then knowingly incorporated the information contained in the exhibits into a "Group Life and Accident Insurance Renewal Summary" which it provided to Viacom. The summary was misleading in that it represented that the cost of communications services would be the same whether performed by ULR or Prudential. Relying on this false and misleading information, Viacom accepted Prudential's offer and agreed to permit ULR to perform the communications.

### b.     Marriott: ULR solicits a fictitious quote to squeeze Aetna out of the bidding process

149.    In December of 2002, Marriott International, Inc. ("Marriott") the hotel chain, contracted with ULR to obtain both life and disability insurance for its employees, 6,590 of whom reside in New York State. ULR first requested quotes for life insurance. Under the customary procedure, the insurers submitting the lowest three quotes—the "finalists"—each get the opportunity to make more detailed presentations to Marriott, in which they can revise their proposals, and the client can consider non-price factors, such as service.

150. UnumProvident submitted a proposal for group life insurance coverage and was accepted as one of the three finalists. Marriott then added new conditions that UnumProvident believed would make it unprofitable for it to continue with its original bid. When UnumProvident informed ULR of its intention to withdraw, ULR protested. If UnumProvident were to withdraw, ULR told UnumProvident, the incumbent carrier Aetna—which had no override agreement with ULR—would become one of the three finalists. ULR had override agreements with the two other insurers and asked UnumProvident to maintain its bid to prevent the possibility that an insurer without an override would win the contract. UnumProvident agreed, but only after it obtained a commitment from ULR that it need not take on the business unless an undisclosed and unlikely contingency was met—that the amount of income covered under the policy would increase by one billion dollars. In other words, ULR, in order to guarantee its continuing stream from overrides, solicited a bid from UnumProvident solely to block a real competitor, Aetna, from the competition.

151. A UnumProvident employee memorialized ULR's agreement to UnumProvident's contingency:

> I did speak with [ULR] ... and confirmed ... that we would meet their request of the .107 rate ... under the condition that we could not sell the case at this rate based on our concern about the expected lower volume creating a shortfall for us. He reiterated and assured me that we would not win this business at these rates due to the significant disparity between our offer and Prudential's. *He understands that we are doing him a favor and is suggesting that he will reciprocate.* (Emphasis added).

152. The fact that ULR would owe UnumProvident a "favor" was significant. Less than a month later, on February 19, 2003—three weeks after UnumProvident agreed to leave its bid in place—ULR presided over the selection of UnumProvident as Marriott's insurer for its employees' disability insurance coverage.

**c.**     **Dell: ULR and UnumProvident agree to falsify a Schedule A in furtherance of override agreement**

153. Dell, Inc. ("Dell") is a manufacturer of personal computers with over 23,000 employees. In 2001, Dell retained ULR to assist it in selecting an insurer for its employees' life

insurance coverage. ULR issued an RFP that indicated that its sole compensation would be a $120,000 payment from the selected insurer.

154. After receiving proposals on Dell's behalf, ULR sought final offers from Prudential, MetLife and UnumProvident. ULR informed UnumProvident that it wanted to give UnumProvident the business—as UnumProvident was already Dell's disability insurer. UnumProvident told ULR that it could only submit the lowest bid if it did not pay ULR the $120,000 that was specified in the RFP. ULR agreed to exempt UnumProvident from paying the $120,000 because ULR's compensation for the deal under the UnumProvident override agreement would be higher than $120,000, more than offsetting that loss.

155. ULR, however, imposed one condition on its agreement: UnumProvident had to report a "commission" of $120,000 on Dell's Schedule A—even though no such payment would be made. ULR made this request—in the words of one UnumProvident employee—because UnumProvident's failure to make a Schedule A report would start "red flags flying" for Dell, which had specifically authorized a payment from the insurer to ULR of $120,000. UnumProvident agreed: "I am not sure we have a choice here [ULR] was our biggest producer last year with $33 million of new premium."

156. As one UnumProvident employee explained:

> We removed the commissions so that we could get to the pricing of one of our competitors, but the client, probably not aware of broker override programs, would find it fishy if there were no commissions paid to ULR for the marketing. So we are making this arrangement so we can facilitate the [Schedule A] expectations from the client. We do not, however, wish to involve Dell in these discussion [sic] at all.

### d.    Ashland:  ULR breaches its anti-override agreement

157. Ashland, Inc. ("Ashland") is a Kentucky-based transportation, construction, chemical and petroleum company. It employs over 22,000 persons. In May 2002, Ashland retained ULR as an independent broker in connection with placing group life, accident and business travel insurance benefits for Ashland's employees. Ashland and ULR executed an agreement under which ULR was to provide Ashland with consulting services for a flat fee of

$47,000. ULR was also required to "forgo any override arrangements that may apply []" in the placing of business.

158.    Notwithstanding this agreement, ULR solicited bids from insurers with whom it had override arrangements; all three finalists fell into this category. Prudential, which won the business, was fully aware that Ashland did not want ULR to receive any additional compensation from it. Nonetheless, ULR's estimated override payment from Prudential was $66,478.

159.    When Ashland learned of the payment to ULR, it demanded an explanation from both Prudential and ULR. In a September 8, 2004 letter to ULR, Ashland's Director of Compensation and Benefits wrote:

> We required an unbiased consultant to perform the work that had no financial incentive on who was selected ... It has now come to our attention that you may have incentive compensation agreements with Metropolitan, Prudential and CIGNA on new business brought to these companies.
>
> ********
>
> I must question whether we received an unbiased review of the proposals from the companies that bid on this business. It is interesting that the three finalists you presented were Metropolitan, Prudential and CIGNA. We have a difficult time in believing that this was a coincidence. For example, Mutual of Omaha, the company that was selected for [accident insurance], was not a finalist and not included in your summary until we specifically requested that they be included.
>
> ********
>
> We believe you misled us and did not follow the terms of the agreement.

160.    Ashland also wrote to Prudential

> [T]he fee for ULR's consulting services under the [Ashland] agreement [with ULR] was completely described in paragraph two of the agreement. The agreement did not designate ULR as Ashland's broker and we expressly advised ULR that the only compensation from this work was their consulting fee.
>
> ********
>
> One of the reasons we selected ULR as a consultant was to receive an unbiased perspective of the market. If they are now receiving any additional compensation because of an agreement with

> Prudential, that would be contrary to our agreement and we would
> question their motive for placing the business with Prudential

161.    Notwithstanding that ULR and Prudential had already agreed to ULR's override

payment terms, Prudential represented to Ashland, as it had previously to UPS in language

approved by Cox, that the costs of the override paid to ULR "are absorbed by Prudential as

overhead and not allocated on a case-specific basis."

## VIII.   FRAUDULENT CONCEALMENT

162.    Plaintiff and Class members had no knowledge of this contract, conspiracy or

combination, or of any fact that might have led to the discovery of it prior to the announcements

of the New York A.G. on October 14 and November 12, 2004 and the various Defendants' press

releases that followed.

163.    Defendants engaged in a successful, illegal price-fixing, bid-rigging and customer

allocation conspiracy that, by its nature, was inherently self-concealing.

164.    Plaintiff and the Class members could not have discovered the alleged contract,

conspiracy or combination at an earlier date by the exercise of reasonable diligence because of

the deceptive practices and techniques of secrecy employed by Defendants and their co-

conspirators to avoid detection of, and fraudulently conceal, their contract, conspiracy or

combination. The contract, conspiracy or combination as herein alleged were fraudulently

concealed by Defendants by various means and methods, including, but not limited to, secret

meetings, minimization of written or electronic records, failure to disclose bid-rigging, price-

fixing and customer allocations to clients and surreptitious communications between the

Defendants by the use of the telephone or in-person meetings in order to prevent the existence of

written records.

165.    The affirmative actions of the Defendants herein alleged were wrongfully

concealed and carried out in a manner that precluded detection.

166.    Defendants also fraudulently concealed their contract, conspiracy or combination

in other ways as well. For example, Defendants falsely represented to their customers that prices

for Insurance Products were arrived at competitively when, in fact, these price increases were the direct result of collusive activity among Defendants as alleged herein. As explained above, the Insurance Broker Defendants also disseminated false and misleading information on their websites concerning their use of MSAs, PSAs, and CSUs.

167.    By virtue of the fraudulent concealment by Defendants and their co-conspirators, the running of any statue of limitations has been tolled and suspended with respect to any claims that Plaintiff and the other Class members have as a result of the unlawful contract, conspiracy or combination alleged in this complaint.

## IX.    INJURY TO PLAINTIFF AND CLASS MEMBERS

168.    During the period covered by this complaint, Plaintiff and members of the Class purchased substantial amounts of Insurance Products from the Defendants.

169.    As a direct result of the conduct, contract, conspiracy or combination of Defendants and their co-conspirators, Plaintiff and members of the Class member paid substantially more for Insurance Products than they would have paid in the absence of Defendants' illegal contract, conspiracy or combination.

170.    By reason of Defendants' illegal conduct, Plaintiff and members of the Class have been injured in their business and property and have suffered damages in an amount presently undetermined.

171.    The contract, conspiracy or combination complained of herein will continue (and to the extent temporarily and only partially abandoned, will resume) absent an injunction. Plaintiff and members of the Class are likely to buy Insurance Products in the future and will be repeatedly injured unless the continuation of this contract, conspiracy or combination is enjoined.

## X.    FIRST CAUSE OF ACTION FOR VIOLATIONS OF THE SHERMAN ACT

172.    Plaintiff incorporates by reference each and every allegation set forth above.

173.    Beginning at least as early as January 1, 1994, and continuing until at least the date of the filing of this Complaint, the exact dates being unknown to Plaintiff, Defendants and their co-conspirators engaged in continuing agreements, understandings, and conspiracy in

restraint of trade to fix prices of, rig bids for, and allocate customers of Insurance Products sold in the United States.

174.    These acts do not constitute the business of insurance regulated under state law. To the extent they might be viewed as falling within the ambit of such business of insurance, they constitute a boycott directed against policy buyers.

175.    In formulating and effectuating the alleged contract, conspiracy or combination, Defendants and their co-conspirators engaged in anti-competitive activities, the purpose and effect of which were to fix prices of, rig bids for, and allocate customers of Insurance Products in the United States.  These activities included the following:

        a.    The Insurance Broker Defendants agreed with the Insurer Defendants to rig bids for Insurance Products;

        b.    The Insurance Broker Defendants agreed with the Insurer Defendants to allocate customers; and

        c.    The Insurance Broker Defendants agreed with the Insurer Defendants to steer business to those who paid the most favorable commissions including under MSAs, PSAs or CSUs.

176.    Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating the unlawful agreements described in this complaint.

177.    During and throughout the period of the conspiracy alleged in this Complaint, Plaintiff and members of the Class purchased Insurance Products from Defendants (or their subsidiaries or controlled affiliates) or their co-conspirators at inflated and supra-competitive prices.

178.    In formulating and effectuating the contract, conspiracy or combination, Defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to artificially raise, fix, maintain and/or stabilize the price of Insurance Products sold in the United States.  These activities included the following:

a.   Defendants participated in meetings and/or conversations to discuss bid-rigging and/or customer allocations with respect to Insurance Products sold in the United States;

b.   Defendants agreed during those meetings and conversations to rig bids for and allocate customers of Insurance Products sold in the United States; and

c.   Defendants agreed during those meetings and conversations to fix the price of Insurance Products sold in the United States.

179.   Defendants' contract, conspiracy or combination constitute an unreasonable restraint of interstate and foreign trade and commerce in violation of Section 1 of the Sherman Act.

180.   As a result of Defendants' unlawful conduct, Plaintiff and the other members of the Class have been injured in their business and property in that they have paid more for Insurance Products than they would have paid in a competitive market.

181.   The unlawful contract, conspiracy and/or combination have had the following effects, among others:

a.   price competition in the market for Insurance Products has been artificially restrained;

b.   prices for Insurance Products sold by the Defendants have been raised, fixed, maintained, or stabilized at artificially high and non-competitive levels;

c.   purchasers of Insurance Products from the Defendants have been deprived of the benefit of free and open competition in the markets for Insurance Products.

182.   As a direct and proximate result of the illegal contract, conspiracy or combination, Plaintiff and the members of the Class have been injured and financially damaged in their respective businesses and property, in that they paid more for Insurance Products than they

would have paid in the absence of the illegal contract, conspiracy or combination. Plaintiff and members of the Class thus have suffered damages in an amount presently undetermined.

183.    During the Class Period, Plaintiff and the other members of the Class purchased substantial quantities of Insurance Products from the Defendants. By reason of the violations of the Sherman Act alleged herein, Plaintiff and the other members of the Class paid more for Insurance Products than they would have in the absence of the illegal contract, conspiracy or combination and, as a result, have been injured in their business and property.

184.    Defendants have participated in one or more overt acts in furtherance of the contract, conspiracy or combination alleged herein and have participated in conspiratorial activities described herein.

## XI.    SECOND CAUSE OF ACTION FOR VIOLATIONS OF 18 U.S.C. §1962(c)

185.    Plaintiff incorporates by reference each and every allegation set forth above.

186.    This cause of action is brought under 18 U.S.C. §1964(c) for violations of 18 U.S.C. §1962(c). Plaintiff and Class members are "persons" within the meaning of 18 U.S.C. §1961(3).

187.    The "enterprise" referred to herein consists of: (a) the Broker Defendants; (b) other insurance brokers not named as defendants; (c) the Insurer Defendants; (d) other insurers not named as defendants that pay contingent fees, agree to rig bids, and/or agree to allocate customers; and (e) insurance brokerage and insurance industry groups that facilitate the practices described herein, such as the Council of Insurance Agents & Brokers ("CIAB") (<http://www.ciab.com>) and the Property Casualty Insurers Association of America ("PCIAA") (<http://www.pciaa.net>). This enterprise engages in activities that affect interstate commerce.

188.    Defendants are distinct and separate from the enterprise.

189.    Defendants have participated in the conduct and operation of the enterprise by:

    a.    sharing and disseminating information regarding bids to clients, insurance placement strategies and coordinated relationships among insurers and/or brokers;

     b.     using trade associations such as those mentioned above as vehicles for disseminating and sharing information necessarily to the bid-rigging, customer allocation and contingent commission practices described above;

     c.     developing the bid-rigging, customer allocation and contingent commission practices described above; and

     d.     recommending purchase of Insurance Products from the Insurer Defendants for the purposes of maximizing contingent commissions and suppressing a free market for such products.

190.    Defendants engaged in conducting the activities of and operating the aforementioned enterprise through predicate acts of mail and wire fraud that violate 18 U.S.C. §§1341 and 1343. Defendants also aided and abetted violations by others of these laws, within the meaning of 18 U.S.C. §2. Thus, Defendants:

     a.     used the United States mail to deliver and/or disseminate agreements, correspondence, policy materials, fee schedules and payments by clients and insurers for the purpose of an unlawful scheme to obtain money by false pretenses or misrepresentations in violation of 18 U.S.C. §1341; and

     b.     transmitted by wire the same types of materials for the purpose of an unlawful scheme to obtain money by false pretenses or misrepresentations in violation of 18 U.S.C. §1343.

191.    The materials transmitted by mail or by wire contained knowing and intentional misrepresentation or omissions that were intended to deceive plaintiff and members of the class. These misrepresentations and omissions included:

     a.     false statements that the Broker Defendants were acting in the best interests of their clients in obtaining Insurance Products when in fact the Broker Defendants were engaged in a conspiracy to maximize their own profits at the expense of their clients;

b.  false statements that the Broker Defendants serve the interests of their clients in negotiating for Insurance Products on their clients' behalf with the Insurer Defendants;

c.  failures to disclose that bids submitted to clients for Insurance Products by the Insurer Defendants were the product of conspiratorial bid-rigging;

d.  failures to disclose the market allocation schemes agreed to by the Broker Defendants and the Insurer Defendants; and

e.  failure to disclose the existence and/or terms of contingent common agreements between the Broker Defendants and the Insurer Defendants and the conflicts of interest created by those arrangements.

192.   Defendants knew or recklessly disregarded that the misrepresentations or omissions described above were material and plaintiffs and members of the Class relied on them in buying Insurance Products.

193.   As a result, Plaintiff and members of the Class have been injured in their business or property by Defendants' overt acts of mail and wire fraud and by their aiding and abetting others to commit such acts.

194.   Defendants have committed a "pattern of racketeering activity" as defined by 18 U.S.C. §1961(5) by committing or aiding and abetting the commission of thousands of acts of racketeering activity (violations of 18 U.S.C. §§1341, 1343) as described above during the past ten years.

195.   Each act of racketeering activity was related, had a similar purpose, involved the same or similar participants and method of commission, had similar results, and impacted similar victims, including plaintiff and members of the Class.

196.   These acts of racketeering activity were undertaken in furtherance of the unlawful scheme described above and thus constitute a "pattern of racketeering activity."

197.    In violation of 18 U.S.C. §1962(c), defendants have conducted or participated in the conduct of the affairs of the aforementioned enterprise through a pattern of racketeering activity.

198.    As a direct result, plaintiff and members of the Class have been injured in their business or property by the predicate acts constituting the pattern of racketeering activity. Plaintiff and members of the Class paid excessive premiums for Insurance Products that they did purchase and received Insurance Products that were inferior to those that would have been made available to them absent the unlawful conduct described herein.

199.    Defendants are therefore liable for treble damages as proven and costs and attorneys' fees.

## XII.   THIRD CAUSE OF ACTION FOR VIOLATIONS OF 18 U.S.C. §1962(d)

200.    Plaintiff incorporates by reference each and every allegation set forth above.

201.    This cause of action is brought under 18 U.S.C. §§1964(a) and (c) for violations of 18 U.S.C. §1962(d). Plaintiff and Class members are "persons" within the meaning of 18 U.S.C. §1961(5).

202.    Defendants have conspired to violate U.S.C. §1962(c) by conducting or participating in the affairs of the aforementioned enterprise through a pattern of racketeering activity. This conspiracy violates 18 U.S.C. §1962(d).

203.    As a direct result of this conspiracy, plaintiff and Class members have suffered injury to business or property by the predicate acts constituting the pattern of racketeering activity. Plaintiff and members of the Class paid excessive premiums for Insurance Products that they did purchase and received Insurance Products that were inferior to those that would have been made available to them absent the unlawful conduct described herein.

204.    Defendants are therefore liable for treble damages as proven and costs and attorneys' fees.

## XIII. FOURTH CASE OF ACTION FOR BREACH OF FIDUCIARY DUTIES BY INSURANCE BROKER DEFENDANTS

205.   Plaintiff incorporates by reference each and every allegation set forth above.

206.   The Insurance Broker Defendants knowingly and willingly assumed a fiduciary responsibility to their clients, including Plaintiff and Class members. As brokers for Plaintiff and Class members, the Insurance Broker Defendants acted as representatives, agents and fiduciaries. Plaintiff and Class members reasonably relied on the Insurance Broker Defendants to inform them of any compensation the Insurance Broker Defendants would receive for their services and what expenses Plaintiff and Class members would incur. Plaintiff and Class members placed trust and confidence in the Insurance Broker Defendants to deal fairly and employ due diligence in obtaining Insurance Products for Plaintiff and Class members.

207.   Federal and/or State common law required the Insurance Broker Defendants to deal fairly with Plaintiff and Class members in the procurement of Insurance Products; Plaintiff and Class members had a legal expectation that the Insurance Broker Defendants would not place their own financial gain above the interests of Plaintiff and Class members.

208.   As brokers for Plaintiff and Class members, acting as their representative, agent and fiduciary, the Insurance Broker Defendants had a duty to disclose material facts to Plaintiff and Class members that were relevant to the parties' relationships. The Insurance Broker Defendants were obligated to disclose to Plaintiff and Class members the existence of Contingent Fees or other payments made by insurance companies which were material facts relating to and affecting the subject matter of the parties' relationships and the procurement of Insurance Products.

209.   As brokers for Plaintiff and Class members, acting as their representative, agent and fiduciary, the Insurance Broker Defendants had a duty to remit to Plaintiff and Class members any undisclosed profit the Insurance Broker Defendants collected in connection with or because of the procurement of Insurance Products on behalf of Plaintiff and Class members.

210.    The Insurance Broker Defendants breached fiduciary duties owed to Plaintiff and Class members, including the duties of good faith, loyalty and trust, the duty to disclose material facts and the duty to remit undisclosed profits by, *inter alia*:

    (a)    entering into undisclosed agreements with insurance companies for Contingent Fees or other payments, thereby knowingly creating an obvious conflict of interest;

    (b)    secretly profiting at the expense of Plaintiff and Class members;

    (c)    failing to disclose to Plaintiff and Class members the existence of the Contingent Fees and agreements with insurance companies; and

    (d)    failing to remit to Plaintiff and Class members the undisclosed profits collected in connection with or because of the procurement of Insurance Products on behalf of Plaintiff and Class members.

211.    As a result of the breach of fiduciary duties owed to them by the Insurance Broker Defendants, Plaintiff and Class members are entitled to the disgorgement of profits or benefits improperly received by the Insurance Broker Defendants via Contingent Fees and related payments by insurance companies.

212.    Plaintiff and Class members are also entitled to punitive damages as a result of the Insurance Broker Defendants' breach of fiduciary duties.

## XIV.    FIFTH CAUSE OF ACTION FOR VIOLATIONS OF STATE ANTITRUST LAWS

213.    Plaintiff incorporates by reference each and every allegation set forth above.

214.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Alabama Code §§8-10-1 *et seq.*

215.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Alaska Stat. §§45.50.562 *et seq.*

216.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Arizona Revised Stat. §§44-1401 *et seq.*

217.     By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Arkansas Stat. Ann. §§4-75-309 *et seq.* and Arkansas Stat. Ann. §§4-75-201 *et seq.*

218.     By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Cal. Bus. & Prof. Code §§16700 *et seq.* and Cal. Bus. & Prof. Code §§17000 *et seq.*

219.     By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Arkansas Stat. Ann. §§4-75-309 *et seq.* and Arkansas Stat. Ann. §§4-75-201 *et seq.*

220.     By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Colorado Rev. Stat. §§6-1-101 *et seq.*

221.     By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Connecticut Gen. Stat. §§35-26 *et seq.*

222.     By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of D.C. Code Ann. §§28-4503 *et seq.*

223.     By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Delaware Code Ann. tit. 6, §§2103 *et seq.*

224.     By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Florida Stat. §§501.201 *et seq.*

225.     By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Georgia Code Ann. §§16-10-22 *et seq.* and Georgia Code Ann. §§13-8-2 *et seq.*

226.     By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Hawaii Rev. Stat. §§480-1 *et seq.*

227.     By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Idaho Code §§48-101 *et seq.*

228.     By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of 740 Illinois Comp. Stat. §§10/1 *et seq.*

229.     By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Indiana Code Ann. §§24-1-2-1 *et seq.*

230.     By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Iowa Code §§553.1 *et seq.*

231.     By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Kansas Stat. Ann. §§50-101 *et seq.*

232.     By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Kentucky Rev. Stat. §§367.175 *et seq.* and relief can be granted in accordance with Kentucky Rev. Stat. §446.070.

233.     By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Louisiana Rev. Stat. §§51:137 *et seq.*

234.     By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Maine Rev. Stat. Ann. 10, §§1101 *et seq.*

235.     By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Maryland Code Ann. Title 11, §§11-201 *et seq.*

236.     By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Massachusetts Ann. Laws ch. 91 §§1 *et seq.*

237.     By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Michigan Comp. Laws. Ann. §§445.773 *et seq.*

238.     By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Minnesota Stat. §§325D.52 *et seq.*

239.     By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Mississippi Code Ann. §§75-21-1 *et seq.*

240.     By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Missouri Stat. Ann. §§416.011 *et seq.*

241.     By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Montana Code Ann. §§30-14-101 *et seq*.

242.     By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Nebraska Rev. Stat. §§59-801 *et seq*.

243.     By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Nev. Rev. Stat. Ann. §§598A *et seq*.

244.     By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of New Hampshire Rev. Stat. Ann. §§356:1 *et seq*.

245.     By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of New Jersey Stat. Ann. §§56:9-1 *et seq*.

246.     By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of New Mexico Stat. Ann. §§57-1-1 *et seq*.

247.     By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of N.Y. General Business Law §340.

248.     By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Kansas Stat. Ann. §§50-101 *et seq*.

249.     By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of North Carolina Gen. Stat. §§75-1 *et seq*.

250.     By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of North Dakota Cent. Code §§51-08.1-01 *et seq*.

251.     By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Ohio Rev. Code §§1331.01 *et seq*.

252.     By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Oklahoma Stat. tit. 79 §§203(A) *et seq*.

253.     By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Oregon Rev. Stat. §§646.705 *et seq*.

254. By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Pennsylvania common law.

255. By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Rhode Island Gen. Laws §§6-36-1 *et seq.*

256. By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of South Carolina Code §§39-1-10 *et seq.*

257. By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of South Dakota Codified Laws Ann. §§37-1 *et seq.*

258. By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Tennessee Code Ann. §§47-25-101 *et seq.*

259. By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Texas Bus. & Com. Code §§15.01 *et seq.*

260. By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Utah Code Ann. §§76-10-911 *et seq.*

261. By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Vermont Stat. Ann. 9 §§2453 *et seq.*

262. By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Virginia Code §§59-1-9.2 *et seq.*

263. By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Washington Rev. Code §§19.86.010 *et seq.*

264. By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of West Virginia §§47-18-1 *et seq.*

265. By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Wisconsin Stat. §§133.01 *et seq.*

266. By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Wyoming Stat. §§40-4-101 *et seq.*

### XV.    SIXTH CAUSE OF ACTION FOR VIOLATIONS OF STATE LAWS FORBIDDING UNFAIR AND/OR DECEPTIVE PRACTICES

267.    Plaintiff incorporates by reference each and every allegation set forth above.

268.    Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection statutes listed below.

269.    As a direct result of defendants' anticompetitive, deceptive, unfair, unconscionable and fraudulent conduct, plaintiff and members of the Class were forced to pay higher prices than they would have in the absence of the conspiracy.

270.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ariz. Rev. Stat. §§44-1522 *et seq.*

271.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ark. Code §4-88-101 *et seq.*

272.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Cal. Bus. & Prof. Code §17200 *et seq.*

273.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices or has made false representations in violation of Colo. Rev. Stat. §6-1-105 *et seq.*

274.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Conn. Gen. Stat. §42-110b *et seq.*

275.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 6 Del. Code §2511 *et seq.*

276.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices or made false representations in violation of D.C. Code §28-3901 *et seq.*

277.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Fla. Stat. §501.201 *et seq.*

278.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ga. Stat. §10-1-392 *et seq.*

279.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Haw. Rev. Stat. §480 *et seq.*

280.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Idaho Code §48-601 *et seq.*

281.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 ILCS §505/1 *et seq.*

282.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Kan. Stat. §50-623 *et seq.*

283.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ky. Rev. Stat. §367.110 *et seq.*

284.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of La. Rev. Stat. §51:1401 *et seq.*

285.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 5 Me. Rev. Stat. §207 *et seq.*

286.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Md. Com. Law Code §13-101 *et seq.*

287.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mass. Gen. L. Ch. 93A *et seq.*

288.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mich. Stat. §445.901 *et seq.*

289.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. §8.31 *et seq.*

290.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Vernon's Missouri Stat. §407.010 *et seq.*

291.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code §30-14-101 *et seq.*

292. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. §59-1601 *et seq.*

293. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Nev. Rev. Stat. §598.0903 *et seq.*

294. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. §358-A:1 *et seq.*

295. Defendants have engaged in unfair competition or unfair, unconscionable or deceptive acts or practices in violation of N.J. Rev. Stat. §56:8-1 *et seq.*

296. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M. Stat. §57-12-1 *et seq.*

297. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C. Gen. Stat. §75-1.1 *et seq.*

298. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.D. Cent. Code §51-15-01 *et seq.*

299. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.Y. General Business Law §§349, 350.

300. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ohio Rev. Stat. §1345.01 *et seq.*

301. Defendants have engaged in unfair competition or unfair or deceptive acts or practices or made false representations in violation of Okla. Stat. 15 §751 *et seq.*

302. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Or. Rev. Stat. §646.605 *et seq.*

303. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 73 Pa. Stat. §201-1 *et seq.*

304. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of R.I. Gen. Laws. §6-13.1-1 *et seq.*

305.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Laws §39-5-10 *et seq.*

306.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. code Laws §37-24-1 *et seq.*

307.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Tenn. Code §47-18-101 *et seq.*

308.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Tex. Bus. & Com. Code §17.41 *et seq.*

309.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Utah Code §13-11-1 *et seq.*

310.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 9 Vt. §2451 *et seq.*

311.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Va. Code §59.1-196 *et seq.*

312.    Defendants have engaged in unfair competition or unfair, deceptive or fraudulent acts or practices in violation of Wash. Rev. Code §19.86.010 *et seq.*

313.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of West Virginia Code §46A-6-101 *et seq.*

314.    Plaintiff and members of the class have been injured in their business and property by reason of Defendants' unfair and deceptive acts alleged in this Count. Their injury consists of paying higher prices than they would have paid in the absence of the conspiracy. This injury is of the type the state consumer protection statutes were designed to prevent and directly results from Defendants' unlawful conduct.

## XVI.    SEVENTH CAUSE OF ACTION FOR UNJUST ENRICHMENT AND DISGORGEMENT OF PROFITS

315.    Plaintiff incorporates by reference each and every allegation set forth above.

316.     Defendants have been unjustly enriched through overpayments by Plaintiff and Class members and the resulting profits.

317.     Under common law principles of unjust enrichment, Defendants should not be permitted to retain the benefits conferred via overpayments by Plaintiff and Class members.

318.     Plaintiffs seek disgorgement of all profits resulting from such overpayments and establishment of a constructive trust from which Plaintiff and Class members may seek restitution.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays:

1.     That the Court determine that the Sherman Act, RICO, breach of fiduciary duty, state antitrust law, and state unfair and/or deceptive practices claims contained herein may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure;

2.     That the unlawful conduct, contract, conspiracy or combination alleged herein be adjudged and decreed to be:

(a)     a restraint of trade or commerce in violation of Section 1 of the Sherman Act;

(b)     violations of 18 U.S.C. §§1962(c) and (d);

(c)     a breach of the fiduciary duties owed by the Insurance Broker Defendants to their clients;

(d)     an unlawful combination, trust, agreement, understanding, and/or concert of action in violation of the state antitrust laws identified in the Fourth Cause of Action herein; and

(e)     violations of the state unfair and deceptive trade practice statutes identified in the Fifth Cause of Action herein.

3.     That Plaintiff and the Class recover damages, as provided by federal and state law, including punitive damages where applicable, and that a joint and several judgment in favor

of Plaintiff and the Class be entered against the Defendants in an amount to be trebled in accordance with such laws;

4.    That Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from in any manner: (a) continuing, maintaining, or renewing the conduct, contract, conspiracy or combination alleged herein, or from entering into any other conspiracy alleged herein, or from entering into any other contract, conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect; and (b) communicating or causing to be communicated to any other person engaged in the sale of Insurance Products, information concerning bids of competitors;

5.    That Plaintiff be awarded restitution, including disgorgement of profits obtained by Defendants as a result of their acts of unfair competition.

6.    That Plaintiff and members of the Class be awarded pre-judgment and post-judgment interest and that interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

7.    That Plaintiff and members of the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

8.    That Plaintiff and members of the Class have such other, further, and different relief as the case may require and the Court may deem just and proper under the circumstances.

## JURY TRIAL DEMAND

Pursuant to Fed.R.Civ.P. 38(b), Plaintiff demands a trial by jury for all issues so triable.

Dated: January 14, 2005

Respectfully submitted,

By: _____

Steven A. Kanner
Douglas A. Millen
William H. London
Robert J. Wozniak
MUCH SHELIST FREED DENENBERG
AMENT & RUBENSTEIN, P.C.
191 North Wacker Drive, Suite 1800
Chicago, IL 60606-1615
Phone: (312) 521-2000
Facsimile: (312) 521-2200

Michael D. Hausfeld
Paul T. Gallagher
Megan Jones
COHEN MILSTEIN HAUSFELD & TOLL,
P.L.L.C.
1100 New York Avenue NW
West Tower, Suite 500
Washington, DC 20005
Phone: (202) 408-4600
Facsimile: (202) 408-4699

Anthony D. Shapiro
Hagens & Berman L.L.P.
1301 Fifth Avenue, Suite 2929
Seattle, WA 98101
Phone: (206) 268-9352
Facsimile: (206) 623-0594

Andrew B. Sacks
John K. Weston
SACKS, WESTON, SMOLINSKY,
ALBERT & LUBER
510 Walnut Street, Suite 400
Philadelphia, PA 19106
Phone: (215) 925-8200
Facsimile: (215) 925-0508

Michael P Lehmann
Thomas P. Dove
THE FURTH FIRM
225 Bush Street, 15th Floor
San Francisco, CA 94104
Phone: (415) 433-2070
Facsimile: (415)

William R. Edwards
THE EDWARDS LAW FIRM, L.L.P.
1400 Frost Bank Plaza
802 North Carancahua
Corpus Christi, TX 78470-0700
Phone: (361) 698-7600
Facsimile: (361) 698-7614

J. Mitchell Clark
LAW OFFICES OF J. MITCHELL CLARK
802 North Carancahua Street, Suite 1800
PO Box 2701
Corpus Christi, TX 78403
Phone: (361) 887-8500

Mark Reinhardt
Mark Wendorf
Garrett Blanchfield
REINHARDT WENDORF &
BLANCHFIELD
E-1250 First National Bank Building
332 Minnesota Street
St. Paul, MN 55101-1314
Phone: (651) 287-2100
Facsimile: (651) 297-6543